Dean WOODS, and all other persons
similarly situated, et al.,
Plaintiffs-Appellants,

v.

COVINGTON COUNTY BANK et al.,
Defendants-Appellees.

Edward HOGLUND et al.,
Plaintiffs-Appellants,

v.

COVINGTON COUNTY BANK et al.,
Defendants-Appellees.

No. 75–3303.

United States Court of Appeals,
Fifth Circuit.

Aug. 11, 1976.

Roger J. Nichols, Mason H. Rose, V, Los Angeles, Cal., J. Michael Rediker, Birmingham, Ala., John H. Blanton, Selma, Ala., William Q. Kendall, Sardis, Ala., for plaintiffs-appellants.

Donald D. Chapman, Arlington, Va., Francis J. Mooney, Jr., New Orleans, La., amici curiae, for Judge Advocates Assoc.

Arthur Gerwin, Nat. Judge Advocate, New York City, amici curiae, for Reserve Officers Assoc.

Oakley W. Melton, Jr., Montgomery, Ala., for Odom, Smith & Argo.

C. L. Whitaker, Hobart A. McWhorter, Jr., William M. Warren, Jr., Birmingham, Ala., for Covington Co.

L. Murray Alley, Crawford S. McGivaren, Jr., Birmingham, Ala., T. W. Thagard, Jr., Montgomery, Ala., for defendants-appellees.

William B. Moore, Jr., Charles E. Porter, Montgomery, Ala., for Camp, Carmouch, and others.

Wilbor J. Hust, Jr., Tuscaloosa, Ala., for intervenor Brock.

Before WISDOM, GOLDBERG and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

The interlocutory appeal before us is from an order of the District Judge disqualifying Roger J. Nichols and his law firm from representing the plaintiffs in the two captioned securities fraud cases. Nichols was adjudged to have violated Canon 9[1] of the Code because he was representing clients in a matter for which he had responsibility while on temporary duty as a reserve officer with the Navy's Judge Advocate General Corps. We hold that Nichols' continued representation of the plaintiffs in these cases does not violate the ethical requirements of the Code of Professional Responsibility, and we therefore reverse.

## I. THE FACTS

The two cases which underlie this appeal were initially filed as class actions to recover funds invested in certain industrial development bonds issued by the City of Tuskegee, Alabama. These actions seek damages from a number of Alabama defendants alleged to have been aiders and abettors of a fraudulent scheme concocted by Alexander & Allen, Inc., a Florida-based group of broker-dealers. The litigation below was prompted by an injunction proceeding brought in the United States District Court for the Southern District of Florida by the Securities and Exchange Commission against Alexander & Allen, Inc., for violations of the anti-fraud provisions of the securities acts. In the Florida case, the Commission alleged that, as one part of a wide-ranging scheme to defraud investors, Alexander & Allen began a solicitation aimed specifically at returning Vietnam prisoners of war who had accumulated substantial sums in back pay during their years of imprisonment. In November of 1974, the court found that the company was perpetrating "a horrible fraud, one that has been vicious and brutal" on the former POWs and a large number of civilian investors. *S.E.C. v. R. J. Allen & Assoc., Inc.*, S.D.Fla. 1974, 386 F.Supp. 866, 874. It is estimated that the POWs alone lost about $316,260.

Several of the former prisoners of war, including Commander Robert Dean Woods, the named plaintiff in one of the class actions below, met while testifying in the Florida case and decided to investigate the possibility of instituting a private suit to recover their investments.[2] The ex-POWs

---

1. Canon 9 requires that an attorney "avoid even the appearance of impropriety." A.B.A. Code of Professional Responsibility, Canon 9 (1970).

2. Nichols and his firm represented the plaintiffs in both of the class actions, each of which was predicated on a separate series of bonds issued by the City of Tuskegee. One class was led by Commander Woods and consisted of eight other POWs, and approximately 112 civilian purchasers of one bond series. The companion suit was filed on behalf of Edward Hoglund and a number of other civilian purchasers of the

turned to the Navy's Office of the Judge Advocate General for advice as to how to proceed and for possible legal assistance. As a result of this request, the Navy began in November of 1974 actively to explore methods by which it could aid these servicemen in recovering their lost investments. Captain E. R. Fink, who headed this effort, sought the advice of Roger J. Nichols, an attorney with expertise in the area of securities fraud who, it happened, was then completing his annual tour of duty as a reserve officer in the Judge Advocate General's Corps. Nichols recommended that no action be taken until an investigation could be made to determine whether a suit could be maintained against parties other than the principals named in the S.E.C.'s action.[3] In addition, Nichols offered to supervise such an inquiry. After completing his brief tour of duty in mid-November, Nichols returned to his private practice in a Los Angeles law firm.

Although the Navy desired to aid the defrauded servicemen, a severe shortage of resources precluded direct participation by the Judge Advocate General's Office in the litigation of such a complex case.[4] In late November, therefore, Captain Fink suggested a course of action by which the Navy would continue to provide legal assistance short of actual litigation but would refer the POWs to several Navy reserve attorneys who were willing to represent them on a contingent fee basis in the contemplated court actions. Captain Fink specifically recommended Nichols as a Naval Reserve officer with a great deal of expertise in securities law and suggested that he be retained as lead counsel in the case.

On December 3, 1974, Captain Fink called Nichols in Los Angeles and asked him to conduct the investigation which they had discussed in November. Although he had already completed his required two weeks of "active duty for training" and despite other demands on his time, Nichols, after some persuasion, agreed to return to active duty on December 16 for an additional five days.

Pursuant to Captain Fink's earlier suggestion, Commander and Mrs. Woods contacted Nichols on December 4 and asked him to represent them and others defrauded in the securities scheme. Nichols, however, informed them that he was returning to active service in order to evaluate their chance for recovery in such a suit and that they should therefore await the outcome of his investigation before undertaking any personal expenditures in connection with the case.

Upon his return to active duty in mid-December, Nichols conducted a five-day "on-the-ground" investigation which included a day-long meeting in Miami with S.E.C. officials familiar with the R. J. Allen injunctive proceeding, an examination of the files of the Deputy Attorney General of Alabama, and interviews with the president and trust

related bond issue. Mrs. Woods and Hoglund had met while at the S.E.C. proceeding in Florida.

3. Based on his experience with similar securities fraud cases, Nichols considered it unlikely that a substantial recovery of the lost funds could be made against the principals named in the S.E.C. action.

4. Ever since 1943, when the Navy initiated a formal legal assistance program, it has provided legal advice, office counseling and legal drafting to its personnel. As originally conceived, the program did not encompass in-court representation of clients. See M. Blake, Legal Assistance for Servicemen; A Report of the Survey of the Legal Profession (1951). By the late 1960s, however, it had become apparent that these traditionally provided services were no longer adequate to meet the increasingly complex needs of military personnel in the lower pay grades who could not afford civilian representation. As a result, the Defense Department established a pilot expanded legal assistance program which was formally approved in 1973. See generally Marks, Military Lawyers, Civilian Courts, and the Organized Bar: A Case Study of the Unauthorized Practice Dilemma, 56 Mil.L.Rev. 1 (1972). The effectiveness of the expanded program has been limited by a statutorily-mandated growth in the functions of the Judge Advocate General's Office which has not been matched by a corresponding increase in congressional appropriations. As a consequence, according to the Judge Advocates Association, in their amicus brief, Navy legal assistance services has been under a serious strain in the last three years.

officer of defendant Covington County Bank. During this investigation, Nichols reported his findings to Captain Fink on a daily basis. After completing the investigation on December 20, 1974, Nichols was released from active service and he accordingly returned to private practice in Los Angeles. Subsequently, Nichols thoroughly discussed all his conclusions with Captain Fink.

On January 11, 1975, Commander and Mrs. Woods again asked Nichols to serve as their personal counsel. Because of his desire to aid the former prisoners of war, his familiarity with the case, and his concern that the statute of limitations was about to run on certain claims,[5] Nichols felt compelled to accept the case. Nichols' participation in the case on a contingent fee basis was personally approved by the Judge Advocate General of the Navy, with the result that the two actions below were filed on January 22 and 27 respectively.

In holding that Nichols' conduct gave rise to an "appearance of professional impropriety" in violation of Canon 9, the District Court relied on Ethical Consideration (EC) 9-3 which is a specific application of this rule to attorneys who are former public employees:

> After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists.

This principle is reiterated in mandatory form in Disciplinary Rule (DR) 9-101(B) which states: "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while a public employee."[6]

The District Judge found that Nichols' tour of duty with the Navy constituted public employment, and that while serving with the Judge Advocate General's Office he had "investigated and passed upon" the POWs claims. Thus the District Court concluded that Nichols "cannot ethically continue that investigation and representation for a fee in his civilian capacity." The appearance of impropriety isolated by the District Judge was that the defendants in the class actions could be substantially disadvantaged "both economically and strategically" by the knowledge of the case Nichols had acquired while a public employee.

## II. PRELIMINARY CONCERNS

Inasmuch as it is well established that a District Court's order granting or denying a motion to disqualify an attorney appearing before it is a "final order" appealable pursuant to 28 U.S.C. § 1291, we properly have jurisdiction in this case. *In re Yarn Processing Patent Validity Litigation*, 5 Cir., 1976, 530 F.2d 83, 85; *United States v. Garcia*, 5 Cir., 1975, 517 F.2d 272, 275; *Tomlinson v. Florida Iron & Metal,*

---

5. In their opening brief, appellants contend that it would have been virtually impossible for any other attorney to have taken this case in a private capacity and filed the complaint prior to January 23, 1975 when the statute of limitations ran on some of the claims. Even with the benefit of his five-day investigation, Nichols was not able to file the complaint until January 22.

6. The Canons, Ethical Considerations and Disciplinary Rules are "three separate but interrelated parts" of the A.B.A. Code of Professional Responsibility. Their respective functions are described as follows:

> The Canons are statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationships with the public, with the legal system, and with the legal profession. They embody the general concepts from which the Ethical Consideration and the Disciplinary Rules are derived.
>
> The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.
>
> The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action.

*ABA Code of Professional Responsibility*, Preliminary Statement (1971) (citations omitted).

*Inc.*, 5 Cir., 1961, 291 F.2d 333, 334; *see Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 2 Cir., 1974, 496 F.2d 800 (*en banc*). Less clear, however, is the standard of review which should govern our assessment of a District Judge's disposition of a motion to disqualify counsel. As we have previously indicated, a District Court is obliged to take measures against unethical conduct occurring in connection with any proceeding before it. *Sanders v. Russell*, 5 Cir., 1968, 401 F.2d 241, 246; *see Ceramco, Inc. v. Lee Pharmaceuticals*, 2 Cir., 1975, 510 F.2d 268, 270–71; *E. F. Hutton & Co. v. Brown*, S.D.Tex., 1969, 305 F.Supp. 371, 376–77. While disqualification orders issued pursuant to this supervisory authority have been held to be within the discretion of the lower court,[7] courts have recently expressed "serious reservations" about whether the scope of appellate review is limited to finding an abuse of discretion in disqualification cases where only a purely legal question is at issue. *Kroungold v. Triester*, 3 Cir., 1975, 521 F.2d 763, 765 n. 2, *quoting American Roller Co. v. Budinger*, 3 Cir., 1975, 513 F.2d 982, 985 n. 3; *see Kramer v. Scientific Control Corp.*, 3 Cir., 1976, 534 F.2d 1085, 1088. In disqualification cases such as this, where the facts are not in dispute, District Courts enjoy no particular functional advantage over appellate courts in their formulation and application of ethical norms. Thus, in this circuit, we have reviewed disqualification cases as we would most other appeals of a judge's findings, applying the "clearly erroneous" test to issues of fact while carefully examining a District Judge's application of relevant ethical standards. *See, e. g., American Can Co. v. Citrus Feed Co.*, 5 Cir., 1971, 436 F.2d 1125 (disqualification order reversed because contrary to controlling ethical principles); *Uniweld Products, Inc. v. Union Carbide Corp.*, 5 Cir., 1967, 385 F.2d 992, *cert. denied*, 390 U.S. 921, 88 S.Ct. 853, 19 L.Ed.2d 980 (1968) (refusal to disqualify

upheld because factual determination not clearly erroneous). Consequently, we are empowered in this case to determine whether the District Court's disqualification order was predicated upon a proper understanding of applicable ethical principles.

■ In evaluating Nichols' conduct, we turn for guidance, as did the District Judge, to the Code of Professional Responsibility. As the legal profession's own source of ethical standards, the Code carries great weight in a court's examination of an attorney's conduct before it. *See Handleman v. Weiss*, S.D.N.Y.1973, 368 F.Supp. 258, 261 n. 4, 263; *E. F. Hutton & Co. v. Brown*, S.D. Tex., 1969, 305 F.Supp. 371, 377 n. 7. The scope of such an inquiry, however, should encompass more than the ABA Canons, Ethical Considerations and Disciplinary Rules. *See International Electronics Corp. v. Flanzer*, 2 Cir., 1975, 527 F.2d 1288, 1293; *J. P. Foley & Co. v. Vanderbilt*, 2 Cir., 1975, 523 F.2d 1357, 1359–60 (Gurfein, J., concurring); *Handleman v. Weiss, supra*, 368 F.Supp. at 263. A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel. *See Emle Industries, Inc. v. Patentex, Inc.*, 2 Cir., 1973, 478 F.2d 562, 564–65. It is with these considerations in mind that we turn to an examination of the District Court's application of EC 9–3 and DR 9–101(B) to the circumstances of this case.

## III. CONGRESSIONAL POLICY

■ At the outset, we observe that Congress has declared in unequivocal terms that inactive reservists and those on active duty for training are not federal employees:

A Reserve of the armed forces who is not on active duty or who is on active duty for training is deemed not an employee or

---

7. *E. g., Gas-A-Tron v. Union Oil Co.*, 9 Cir., 1976, 534 F.2d 1322, 1324–25 (per curiam); *In re Gopman*, 5 Cir., 1976, 531 F.2d 262, 266; *Hull v. Celanese Corp.*, 2 Cir., 1975, 513 F.2d 568, 571; *Richardson v. Hamilton International* *Corp.*, 3 Cir., 1972, 469 F.2d 1382, 1386, *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973); *cf. Waters v. Western Co. of North America*, 10 Cir., 1971, 436 F.2d 1072.

an individual holding an office of trust or profit or discharging an official function under or in connection with the United States because of his appointment, oath, or status, or any duties or functions performed or pay or allowances received in that capacity.

5 U.S.C. § 2105(d). As is stated in the House Committee report on the bill, section 2105(b) was enacted

> to remedy a condition occasioned by a ruling of the Attorney General that prevents reserve officers, who are attorneys at law, from practicing before the Treasury Department or from performing any other work that the law forbids officers of the Government to undertake.
>
> The Attorney General has recently handed down an opinion, which supports the contention of the Treasury Department that reserve officers are "officers of the Government" under the penal statutes of the United States. Unless remedial legislation is enacted it is feared that there will be many resignations from the Officers' Reserve Corps because of this restrictive construction.

H.R.Rep.No.1884, 71st Cong., 2d Sess., at 2 (1930). The House report went on to quote from the War Department's explanation of the bill's purposes:

> Reserve officers who are members of the bar are therefore in some doubt as to their status in litigation in which the Government may be involved. Many other reserve officers who are interested in the civil affairs of their own states are similarly in doubt as to their status under state constitutions many of which deny State offices to citizens who are officials of the Federal Government.

*Id.* at 3.

Congress evidently recognized that inactive or part-time reservists are dependent upon civilian occupations or professions for their livelihood, and therefore that they should not be subject to the numerous blanket disabilities imposed on government employees by both federal and state law. As Senator Reed noted during the floor debate on the bill:

> Of course, nobody ever dreamed that a reserve officer should be crippled from pursuing his ordinary peace-time vocation when he was not on active duty; [such a rule] would force the retirement from the Reserve Corps of a large number of valuable, useful officers.

72 Cong.Rec. 11892–93, 71st Cong., 2d Sess. (1930). A similar concern is evident in several other statutes which protect reservists in their civilian vocations.[8] Thus, as the Reserve Officers Association intimates in its *amicus* brief, there is an unmistakable congressional intent to protect reservists from being disadvantaged in employment merely because of their status as members of the armed services. We conclude, then, that EC 9–3 and DR 9–101(B) are not applicable to reservists like Nichols who have been on active duty for training.

This is not to say, however, that reservists protected by section 2105(d) are exempt from the Canon 9 requirement that a lawyer should avoid even the appearance of professional impropriety. By eliminating blanket prohibitions against the civilian em-

---

8. Congress has provided, for example, that:

> Membership in a reserve component of the armed forces or in the National Guard does not prevent an individual from practicing his civilian profession or occupation before, or in connection with, an agency of the United States.

5 U.S.C. § 502. A similar intent to protect the civilian occupations of reservists is evident in the following provision:

> Any person who holds a position [in federal or private employment] shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a reserve component of the Armed Forces of the United States.

50 App. U.S.C. § 459(c)(3). Further evidence of this policy is found in 5 U.S.C. § 5534 which provides:

> A Reserve of the armed forces or member of the National Guard may accept a civilian office or position under the Government of the United States or the Government of the District of Columbia, and he is entitled to receive the pay of that office or position in addition to pay and allowances as a Reserve or member of the National Guard.

ployment of reservists, Congress did not intend to relieve them of the ethical obligations of their respective professions.[9] In our view, the congressional policy described above simply requires that Canon 9 disqualification orders be based on a specifically identifiable appearance of improper conduct. As will be demonstrated below, Nichols' activities both during and after his brief tour of duty with the Navy do not give rise to even the most tenuous inference of improper professional conduct.

## IV. THE ROLE OF CANON 9

▆▆▆▆ Even in the absence of the congressional policy prohibiting blanket restrictions on the civilian employment of reservists, we would reverse the District Court's order disqualifying Nichols. Canon 9 does not require the disqualification of every attorney who has been privately retained in a matter for which he had substantial responsibility while associated with the Government. The A.B.A. itself has recognized that the limitation on former government attorneys which is now codified in EC 9–3 and DR 9–101(B) "was not intended to have the effect that its words too literally construed imply." A.B.A. Comm. on Pro-

fessional Ethics and Grievances, Formal Opinion 26 (1930).[10] Such an inflexible application of Canon 9 would frequently defeat important social interests including the client's right to counsel of his choice, the lawyer's right freely to practice his profession, and the government's need to attract skilled lawyers. *See Emle Industries, Inc. v. Patentex, Inc.,* 2 Cir., 1973, 478 F.2d 562, 564–65; Kaufman, The Former Government Attorney and the Canons of Professional Ethics, 70 Harv.L.Rev. 657 (1957). Consequently, as Judge Gurfein has indicated only recently:

> It behooves this court, . . . while mindful of the existing Code, to examine afresh the problems sought to be met by that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.

*International Electronics Corp. v. Flanzer,* 2 Cir., 1975, 527 F.2d 1288, 1293, *quoting* Brief for the Connecticut Bar Association

9. Indeed, the Navy specifically acknowledges that the Code of Professional Responsibility governs the conduct of all legal assistance officers on active duty—be they regular or reserve. Dep't of Navy, Manual of the Judge Advocate General § 1903, 32 C.F.R. § 727.3 (1975). Congress, moreover, created an explicit exception to section 2105(d) in 18 U.S.C. § 202 which defines a reservist on active duty for training as a "special Government employee." Under 18 U.S.C. § 207, a person who has been a special government employee is subject to penal sanctions if he acts "as agent, or attorney for, anyone other than the United States" in a matter in which he personally participated while with the Government or if he appears personally in court or before an agency in a matter which had been "under his official responsibility."

Section 207, however, is only applicable if the United States presently "is a party or has a direct and substantial interest" in the matter or proceeding in question. As our discussion in Part V–A of this opinion will demonstrate, the Government has no direct interest in the class actions underlying this appeal. Therefore, section 207 is not applicable to this case.

10. Opinion 26 dealt with Canon 36 of the now superseded Canons of Professional Ethics. Canon 36 provided, in relevant part, that:

> A lawyer, having once held public office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ.

EC 9–3 and DR 9–101(B) have carried forward the general principles of Canon 36. *General Motors Corp. v. City of New York, supra,* 501 F.2d at 649 n. 18; *see* R. Wise, Legal Ethics 122 n. 2 (1970).

In passing, we note that while the old and new provisions do not differ in principle, the "investigated or passed upon" standard of Canon 36 has been superseded by the "substantial responsibility" test of EC 9–3 and DR 9–101(B). A.B.A. Standing Comm. on Ethics and Professional Responsibility, Formal Opinion 342 (1975). The District Court erred, therefore, in holding that the "investigated or passed upon" standard has continuing vitality.

as Amicus Curiae at 7; *see J. P. Foley & Co. v. Vanderbilt*, 2 Cir., 1975, 523 F.2d 1357, 1359–60 (Gurfein, J., concurring).

The District Judge's unduly rigid construction of Canon 9 appears to have stemmed from a misunderstanding of its admonition that "[a] lawyer should avoid even the appearance of professional impropriety." Although the principle did not receive overt expression until the promulgation of the Code in 1970, the "appearance of evil" doctrine was implicit in several of the old Canons of Professional Ethics and was directly stated in a number of A.B.A. opinions interpreting them. R. Wise, Legal Ethics 125 (1970). Thus, even under the old Canons, the absence of demonstrable wrongdoing was usually not enough. *See, e. g., United States v. Trafficante*, 5 Cir., 1964, 328 F.2d 117, 120. An attorney's conduct had to be sufficiently unambiguous "to merit the approval of all just men." A.B.A. Canons of Professional Ethics, *Preamble* (1908).

With adoption of Canon 9 in 1970, express recognition was given to the applicability of this principle to all aspects of a lawyer's professional life. The requirement that a lawyer avoid even the appearance of impropriety reflects the bar's concern that some conduct which is in fact ethical may appear to the layman as unethical and thereby could erode public confidence in the judicial system or the legal profession. A.B.A. Code of Professional Responsibility, EC 9–2 (1970). Similarly conscious of the need to keep both the public and private segments of the profession above suspicion, courts have disqualified attorneys under the appearance of evil doctrine even though the record was free of any evidence of actual wrongdoing. *E. g., General Motors Corp. v. City of New York*, 2 Cir., 1974, 501 F.2d 639, 641; *United States v. Trafficante*, 5 Cir., 1964, 328 F.2d 117, 120; *see* A.B.A.,

Standing Committee on Professional Ethics, Informal Opinion No. 885 (Nov. 2, 1965).

It does not follow, however, that an attorney's conduct must be governed by standards which can be imputed only to the most cynical members of the public. Inasmuch as attorneys now commonly use disqualification motions for purely strategic purposes,[11] such an extreme approach would often unfairly deny a litigant the counsel of his choosing. Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary. An overly broad application of Canon 9, then, would ultimately be self-defeating. Therefore, what has been said with respect to judicial conduct is equally applicable here: a lawyer need not "yield to every imagined charge of conflict of interest, regardless of the merits, so long as there is a member of the public who believes it . . . Surely there can be some objective content to any inquiry into whether the 'appearance of justice [or propriety]' has been compromised in a given case." J. MacKenzie, The Appearance of Justice 240 (1974). Consequently, while Canon 9 does imply that there need be no proof of actual wrongdoing, we conclude that there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur.[12]

Under Canon 9, then, the standard governing the conduct of all former government lawyers is consistent with the approach mandated by the congressional policy toward reservists in particular. We therefore turn to an examination of the facts of this case to determine whether there is a reasonable possibility that Nichols engaged in improper conduct while on active duty with the Navy.

---

11. *International Electronics Corp. v. Flanzer*, 2 Cir., 1975, 527 F.2d 1288, 1289.

12. We emphasize that an attorney need not be disqualified even where there is a reasonable possibility of improper professional conduct. As we have seen, a court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case. Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied.

## V. LIMITATIONS ON FORMER GOVERNMENT ATTORNEYS

Our review of the relatively sparse precedent in this field reveals that the limitation on former government attorneys has been construed as applying to two distinct types of improper conduct. Most frequently, disqualification occurs when private representation of a client calls into question a lawyer's conduct while a public official. Occasionally, though, an attorney has been disqualified because his association with the government gave him an improper advantage over his adversaries in private litigation. The facts of this case, however, do not fit into either of these categories.

### A. Apparent Conflicts of Interest While a Public Employee

 The purpose most often ascribed to the limitation on former government attorneys is to avoid

the manifest possibility that [a former government lawyer's] action as a public official might be influenced (or open to the charge that it had been influenced) by the hope of later being employed privately to uphold or upset what he had done.

A.B.A. Comm. on Professional Ethics, Opinion No. 37 (1931); [13] see H. Drinker, Legal Ethics 130 (1953). In part, the Code's limitation on former government lawyers is designed to forestall the charge that a particular position taken by a public official was in anticipation of private employment. See United States v. Standard Oil Co., S.D. N.Y.1955, 136 F.Supp. 345, 359. This, of course, is an ethical problem which all public officials must confront. See P. Douglas, Ethics in Government 51–52 (1952). A number of courts, however, have held that EC 9–3 and DR 9–101(B) operate even where an attorney's representation of a private client does not impugn the position he took in a particular matter while in public

employment.[14] These courts have been concerned with a former government lawyer's special vulnerability to the charge that he used his public position to develop a suit which he would later bring in a private capacity. General Motors Corp. v. City of New York, 2 Cir., 1974, 501 F.2d 639, 650; Telos, Inc. v. Hawaiian Telephone Co., D.Hawaii 1975, 397 F.Supp. 1314, 1316–17; Handleman v. Weiss, S.D.N.Y.1973, 368 F.Supp. 258, 264; Allied Realty v. Exchange National Bank, D.Minn.1968, 283 F.Supp. 464, 469 aff'd, 8 Cir., 1969, 408 F.2d 1099; see Comment, 16 B.C.Ind. & Comm.L. Rev. 651, 656–57 (1975). As Chief Judge Kaufman has noted, "there lurks great potential for lucrative returns in following into private practice the course already charted with the aid of governmental resources." General Motors Corp. v. City of New York, supra, 501 F.2d at 650. A government attorney might, for example, concentrate only on potentially profitable cases with a view toward subsequent private gain. See Allied Realty v. Exchange National Bank, supra, 283 F.Supp. at 469. Thus a former government lawyer's representation of a client could call into question his overall conduct as a government official, as well as the decision he reached in a particular matter.

As our review of the undisputed facts of this case demonstrates, and as appellees apparently concede, Nichols' retention by Commander Woods, his wife, and other class members does not impugn any of his actions while on active duty in the Judge Advocate General's Office.

Clearly, Nichols did not have the authority or opportunity improperly to concentrate Navy resources on the POWs' problem to the detriment of his other official responsibilities. Indeed, we have seen that the entire Navy investigation was under the control of and being planned by Nichols' supe-

---

**13.** Opinion 37 construes Canon 36 of the old Canons of Professional Ethics. See note 10 supra.

**14.** As Opinion 37 makes clear, the side chosen by a former government lawyer in private prac-

tice. need not be antiethical to the position taken while a public employee for there to be a violation of EC 9–3 and DR 9–101(B). See General Motors Corp. v. City of New York, 2 Cir., 1974, 501 F.2d 639, 650 & n. 20.

riors in the Office of Judge Advocate General. Nichols' advice and investigative activities, moreover, were at the behest and under the close supervision of Captain Fink. Thus, as the District Judge indicated, Nichols "was acting *at all times* on the instructions of his superiors." (Emphasis supplied.)

In addition, there can be no assertion that Nichols' investigation and his resulting advice to the Navy was affected by the prospect of his employment by Commander and Mrs. Woods. Inasmuch as Nichols is presently representing the Woodses and all other plaintiffs on a contingent fee basis, he is not open to the charge of having induced the Judge Advocate General's Office to proceed with a meritless case.

A legal assistance officer's function, moreover, is significantly different from that of other government lawyers. *See Coles, Manter & Watson v. Denver District Court,* 1972, 177 Colo. 210, 493 P.2d 374, 375. Rather than being charged with public matters in which the government is the client, a legal assistance attorney owes a preeminent duty to the private individual who, in effect, retains him.[15] Under section 1906(c) of the Navy Judge Advocate General's Manual, for example, Nichols was required "to exercise his independent professional judgment on behalf of his client within the standards promulgated in the Code of Professional Responsibility . . .." 32 C.F.R. § 726.6(c) (1975).[16] Similarly, the A.B.A. Code itself mandates that a military legal assistance officer employ "his independent professional judgment on behalf of his client

without interference or control by any organization or other person." A.B.A. Code of Professional Responsibility, DR 2–103(D) (3) (1970); *see* A.B.A. Standing Comm. on Ethics and Professional Responsibility, Informal Opinion 1166 (Aug. 9, 1970).

Because the Government has no direct interest in a legal assistance officer's relationship with his client, any ethical questions arising out of that relationship are best dealt with under those provisions of the Code which specifically delineate an attorney's obligations to his client. *See, e. g.,* A.B.A. Code of Professional Responsibility, Canons 4, 5, 6 & 7 (1970). Consequently, where there is no claim that a legal assistance lawyer used his public office as a means of soliciting clients or otherwise garnering lucrative cases, the Canon 9 limitation on a former government attorney should not be brought into play against apparently improper conduct occurring during his tenure with the Government.

The District Judge, however, took the position that the Woodses were not Nichols' clients while he was on active duty because "he was acting at all times on the instructions of his superiors and in the interests of his employer, the United States Navy." Nichols' superiors, of course, were all attorneys in the Judge Advocate General's Office who were coordinating the Navy's legal assistance efforts on behalf of the POWs. All the lawyers working on this case were bound by the traditional obligations of a lawyer to his client. Thus, the fact that Nichols did not head the Navy's efforts in

15. It is well established that the traditional lawyer-client relationship exists even though some third party pays the legal fees. *See, e. g., Western Auto Supply Co. v. Dillard,* W.Va. 1970, 153 W.Va. 678, 172 S.E.2d 388, 393; *Fessler v. Weiss,* Ill.1952, 107 N.E.2d 795; A.B.A. Code of Professional Responsibility, EC 5–23 n. 27 (1970).

16. The lawyer-client privilege receives specific recognition under section 1908 of the Manual of the Judge Advocate General:

All information and files pertaining to the persons served will be treated as confidential and privileged . . . as outlined in Canon 4 of the Code of Professional Responsibility, . . . .. These privileged matters may

not be disclosed to *anyone* by personnel rendering the service, except upon the specific permission of the person concerned, and *disclosure thereof may not be ordered by superior or military authority.* . . . Protection of the confidences of a legal assistance client is essential to the proper functioning of the legal assistance program in order to assure all military personnel, regardless of grade, rank, or position, that they may disclose frankly and completely all material facts of their problem to those rendering the service without fear that their confidence will be abused or used against them in any way. 32 C.F.R. § 727.8 (1975) (emphasis supplied).

no way lessened his obligation as a legal assistance officer to represent the Woodses' interests independently, competently, and zealously. Moreover, contrary to the District Court's conclusion, the Navy's only purpose in providing legal assistance services to Navy personnel is to improve morale and reduce disciplinary problems. *See* Dept. of Navy, Manual of the Judge Advocate General §§ 1901 & 1902, 32 C.F.R. §§ 727.1 & .2 (1975). It is clear, then, that the Government had no direct interest in Nichols' conduct of the investigation which was paramount to or in any way inconsistent with that of the defrauded servicemen.

In short, there is no reasonable possibility under the facts of this case that Nichols' conduct while on active duty violated the public trust. We therefore turn to a consideration of whether his five-day investigation improperly disadvantaged the appellees.

### B. The Improper Use of Information Acquired While a Public Employee

Although Canon 9 has generally been invoked because of the appearance that a public official's action may have been influenced by the prospect of private employment, it has, in a few instances, been employed to prevent the private use of information obtained by a lawyer while in public office. The impropriety perceived in these cases is not so much that a public employee may have contemplated private gain while performing official functions as it is that his exercise of governmental power may be used to the prejudice of one side in a private suit. Thus, the focus of our inquiry must shift from the propriety of Nichols' actions while in the Government to the effect of that conduct on the cases below.

Generally, this construction of Canon 9 has been used to disqualify a former prosecutor from representing a private client in a civil matter related to or arising out of the criminal prosecution in which he had substantial responsibility. *Allied Realty v. Exchange National Bank,* D.Minn.1968, 283 F.Supp. 464; *Hilo Metals Co. v. Learner*

*Co.,* D.Hawaii 1966, 258 F.Supp. 23; *see* A.B.A. Comm. on Professional Ethics & Grievances, Formal Opinion No. 135 (1935). *But see Control Data Corp. v. International Business Machines Corp.,* D.Minn.1970, 318 F.Supp. 145. A rationale for this rule is that:

> The investigation of the prosecutor was ostensibly in the exercise of official authority; information was obtained from persons, who may have felt, quite naturally, under a sense of coercion or respect for actual or supposed power. The person later sued as a tort feasor may thus have disclosed facts inimical to his best interests in a civil action. Unsuspecting, unshielded, and at serious disadvantage, he submitted to interrogation by one who later, as opposing counsel in a civil action, might use the knowledge thus acquired against him.

> . . . . .

> If the lawyer making the approach does so under sanction or color of official power, he thereby more certainly disqualifies himself from later participation as counsel in any civil litigation having its basis in or connected with the occurrence previously investigated as to its potential criminal aspects.

> A prosecutor cannot profit by information gained in the course of his duties as a public official. Public policy forbids.

A.B.A. Comm. on Professional Ethics & Grievances, Formal Opinion No. 135, *supra.* A former prosecutor, moreover, has had access to materials such as investigative reports and grand jury minutes which may not be available to his opponents in a civil trial. *See Allied Realty v. Exchange National Bank, supra,* 283 F.Supp. at 466.

As Opinion 135 implies, however, officials other than prosecutors could improperly use information obtained while a public employee. Indeed, in *Handleman v. Weiss, supra,* a lawyer formerly associated with the Securities Investors Protection Corporation was disqualified on these grounds even though SIPC was technically not a governmental agency. 368 F.Supp. at 263. Finding the attorney in question to be "in many

ways a representative of governmental interests," the *Handleman* court concluded that his investigative work on behalf of SIPC

> gave him a real advantage in learning of any illicit activities in which defendants may have been engaged. He learned from the SEC that there were questions concerning the activities of Weiss, and it became part of his job to investigate these questions. It seems probable that in his investigations *Salomon [the SIPC attorney] was able to obtain information that he would have been unable to secure if he had been interviewing in a private capacity.* . . .

*Id.* at 263 (emphasis supplied). As the court pointed out, the depositions taken by the former SIPC lawyer were not available for public inspection.[17] *Id.* at 264.

In sum, former government officials have been disqualified in cases in which, "under sanction or color of official power," they could have obtained an advantage over their adversaries in a private suit which they could not otherwise have obtained. *See Allied Realty v. Exchange National Bank,* 8 Cir., 1969, 408 F.2d 1099, 1102, *aff'g,* D.Minn.1968, 283 F.Supp. 464; A.B.A. Comm. on Professional Ethics & Grievances, Opinion No. 135, *supra.* In particular, both the A.B.A. and courts have felt that specific information obtained by the exercise of government power should not be used to the prejudice of a party to private litigation.

As a legal assistance officer, however, Nichols did not possess any investigative authority beyond that available to a private lawyer. *See* Dep't. of the Navy, Manual of the Judge Advocate General, § 1906(a) & (b), 32 C.F.R. § 727.6(a) & (b) (1975). Neither is there any allegation that Nichols ever held himself out to be an investigating officer acting on behalf of United States

Navy or as having any special governmental authority. Indeed, the undisputed facts adduced below reveal that both the S.E.C. office in Miami and the Alabama Attorney General's office were well aware that Nichols was appearing on behalf of the defrauded servicemen and that he was investigating the possibility of a private action. Both the S.E.C. and the State of Alabama, in fact, explicitly predicated their cooperation with Nichols' investigation on a clear understanding that the class actions would be brought on behalf of all persons defrauded by the Alexander & Allen scheme. In Nichols' meetings with persons who are presently defendants in the class actions below, it is undisputed that Nichols clearly stated that he was making a factual investigation to determine whether there was any basis for recovery by the ex-POWs against aiders and abettors to this securities fraud. Under these circumstances, it cannot fairly be said that Nichols gained his information by "the exercise of official authority" or that he would have been unable to secure this information if he had been appearing in a purely private capacity.

■ The District Judge, however, based his disqualification order on a quite different putative impropriety. Relying on *Allied Realty v. Exchange National Bank, supra,* the District Court concluded that Nichols' "retention by plaintiffs in these lawsuits would amount to a substantial advantage to them and a corresponding disadvantage to defendants, both of which constitute the 'appearance of evil' which is the target of the Canons. . . ." The *Allied Realty* court did state that

> a former government lawyer is employed and is expected to bring with him and into the proceedings a personal knowledge of a particular matter—for which the government paid him while he was learning it and for which now the client

---

17. The *Handleman* court also found that even if the information were freely obtainable, the SIPC lawyer would be subject to the charge that he used his position to develop a suit which he would later bring in a private capacity. 368 F.Supp. at 264. Indeed, the District Judge in that case found that the lawyer had "a

definite intent . . . to develop a case against the defendants." *Id.* at 264 n. 11. As we have seen, Nichols did not have either the authority or opportunity to manipulate government resources or power to his private advantage. *See* Part V-A, *supra.*

who employs him theoretically will not have to pay.

283 F.Supp. at 467. The court found this conduct to be improper because a former government attorney ·

is in a position either to charge a client a fee because of his knowledge acquired through his former office, in which event he is then being remunerated twice in essence, or if he does not charge a fee therefor, the private litigant fortunate enough to obtain his services places the adverse party at a disadvantage both economically and strategically.

Id. at 468.

Allied Realty, however, concerned a former Assistant United States Attorney who had access to secret FBI reports and grand jury proceedings. Id. at 466. As we have seen, information obtained by the exercise of this sort of public power should not be used for private gain or to the prejudice of an adverse party in a lawsuit.

Because there was no exercise of official authority in this case, the District Judge's reliance on Allied Realty necessarily implies that it is improper for the Government to give any aid to one party in a private lawsuit. Indeed, appellees' essential contention in both their brief and at oral argument is that the underlying purpose of the limitation on former government attorneys "is to prevent a disparity of equities among litigants." Specifically, they contend that the Navy, by planning the class actions, financing the investigation, and referring the POWs to Nichols, were engaged in "an unprecedented exercise of power" which disadvantaged the defendants below and thereby created the appearance of impropriety prohibited under Canon 9.

■ Obviously, all government-provided legal aid is "a substantial advantage" to those receiving it and, of course, "a corresponding disadvantage" to their adversaries. The logically inescapable extension of the District Judge's rationale, then, is that all public legal assistance programs violate Canon 9.[18] While the District Judge intended no such untoward result, we must nevertheless reject his reasoning.[19]

The District Court also justified the disqualification of Nichols on the ground that he may ultimately receive private remuneration for work done under the auspices of the Judge Advocate General Corps. The evil perceived by the District Court is not that the lawyer's private compensation calls into question the propriety of his conduct while in government office.[20] Rather, it is simply that Nichols may be paid twice for the same work.

■ However, the Canon 9 limitation on former government attorneys does not apply to the problem of excessive remuneration. Where, as here, there is no reasonable possibility that a government lawyer violated the public trust, the question of his remuneration is best answered by those provisions of the Code specifically addressed to the problem of reasonable attorney fees. E. g., EC 2–17 & 2–18, DR 2–106 (A) & (B).

■ A disqualification order is obviously an ill-suited remedy to the problem of excessive attorney's fees under these provisions of the Code. In this case, for example, Nichols is representing the plaintiffs on a contingent fee basis. At this point in the litigation it is not certain that he will receive any compensation at all. As appellants point out, moreover, even if plaintiffs ultimately prevail, the fees in the class actions below will be set by the District

18. The Code, however, implicitly authorizes both civilian and military legal assistance offices. See A.B.A. Code of Professional Responsibility, DR 2–103(D) (1970).

19. It therefore is not improper for Nichols also to represent the civilian plaintiffs in these class actions. Their presence in these cases, moreover, does not raise any of the possible improprieties described above.

20. Even if it were, the District Court could, as an alternative to the drastic remedy of disqualification, have given Nichols the opportunity to adjust the contemplated method of compensation so as to eliminate any appearance of impropriety. See Comment, B.C.Ind. & Comm.L. Rev. 651, 657 (1975). But see Telos, Inc. v. Hawaiian Telephone Co., D.Hawaii 1975, 397 F.Supp. 1314, 1317.

Court. *See* 7A C. Wright & A. Miller, Federal Practice and Procedure (1972, Supp.1975). As a consequence, Nichols' contemplated method of compensation cannot be a ground for his disqualification from this case.

## VI. ·CONCLUSION

We have seen that Nichols' participation in the class actions underlying this appeal does not impugn his conduct while on active duty with the Navy and does not improperly disadvantage appellees. On the other hand, to permit the District Court's disqualification order to stand would inflict substantial harm on military legal assistance programs and would prejudice appellants' cases below. Inasmuch as attempts to disqualify opposing counsel are becoming increasingly frequent, we cannot permit Canon 9 to be manipulated for strategic advantage on the account of an impropriety which exists only in the minds of imaginative lawyers. Therefore, the disqualification order of the District Court is

REVERSED.