## DELTA AIR LINES, INC., Relator,

### v.

### Honorable Charles C. COOKE III, Judge, 18th District Court, Johnson County, Texas, Respondent.

#### No. 10–95–256–CV.

Court of Appeals of Texas, Waco.

Nov. 1, 1995.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

### ORDER

PER CURIAM.

The submission of this cause is set aside, and the order of this court dated September 7, 1995, granting Relator's motion for leave to file petition for writ of mandamus and for temporary relief staying the trial court proceedings, is withdrawn as the motion for leave was improvidently granted. *See Brannum v. Fry,* 761 S.W.2d 301 (Tex.1988).

The motion for leave to file petition for writ of mandamus is denied.

VANCE, J., dissents.

VANCE, Justice, dissenting.

To the extent that a corporate entity can be upset, Delta Airlines is upset. This is because its lawyers are now suing it in another county for another client in an unrelated matter. McKool Smith, P.C. of Dallas has represented Delta for over five years in litigation that grew out of the proposed multi-billion dollar expansion of the Dallas–Fort Worth Airport. McKool Smith has charged Delta over $220,000 for representing it, and has had access to its inner-most corporate structure, procedures, and thinking. McKool Smith is now alleging that Delta is guilty of, among other things, defamation, intentional infliction of emotional distress, and business disparagement. Delta, it seems to me, is justified in being upset, but being upset is not the legal issue involved.

Robert A. Norris and Norris Industries, Inc., represented by McKool Smith, sued Delta Airlines and several Delta employees over termination of a mail-handling contract that Norris had with Delta for handling mail at the Dallas–Fort Worth airport. Norris seeks actual and exemplary damages based upon Delta's statements to the media concerning the reasons for the termination. As attorney for Norris, McKool Smith is directly accusing Delta of intentional and malicious conduct and is seeking to recover actual and exemplary damages.

After being sued by its own lawyers, Delta filed a motion to disqualify McKool Smith on the grounds that the law firm cannot, without Delta's consent, concurrently represent another client adverse to Delta, absent "exceptional circumstances."[1] When the motion was heard, McKool Smith did not present any "exceptional circumstances" that would justify the representation. It simply elected to stand on its assertion that Texas law allows the adverse representation. McKool Smith's position can be characterized as: "If you can't discipline me for it, you can't disqualify me for it."

However, the framers of the ethical rules for lawyers in Texas have always asserted that those rules are *minimum* standards of

---

1. Delta also alleged a disqualification under Rule 1.09, asserting that a McKool Smith partner, while with another firm, represented it in a sub-

stantially related matter. TEX. DISCIPLINARY R.PROF. CONDUCT 1.09 (1989). I do not reach that assertion.

professional conduct, the violation of which will subject a lawyer to discipline, and are not rules governing procedural disqualification of lawyers in judicial proceedings. *See* TEX. DISCIPLINARY R.PROF. CONDUCT preamble (1989), *reprinted in* TEX. GOV'T CODE· ANN., tit. 2, subtit. G app. A (Vernon Supp. 1995) (STATE BAR RULES art. X, § 9); Robert P. Schuwerk & John F. Sutton, Jr., *A Guide to the Texas Disciplinary Rules of Professional Conduct,* 27A HOUS.L.REV. 1, 100–01 (1990). The preamble of the Disciplinary Rules clearly states, "these rules are not designed to be standards for procedural decisions." TEX. DISCIPLINARY R.PROF. CONDUCT preamble ¶ 15 (1989). The rules attempt to induce ethical behavior by "stating minimum standards of conduct below which no lawyer can fall without being subject to disciplinary action." *Id.* ¶ 7.

Indeed, courts have accorded the rules that status. *Woods v. Covington County Bank,* 537 F.2d 804, 812 (5th Cir.1976) (contending that standards such as ABA canons are useful guides but are not controlling in adjudicating disqualification motions); *Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990) (noting that disciplinary rules do not control motions to disqualify, but may be used as guidelines to show merits of those motions). The Supreme Court's directive in *Spears* that "the burden is on the movant to establish with specificity a violation of one or more of the disciplinary rules," relied on by Respondent, must be read in context. *Spears,* 797 S.W.2d at 656. That statement follows a paragraph in which the court explains why it will use the disciplinary rules as "guidelines" to decide the case.[2] *Id.*

Delta asserts—and McKool Smith does not dispute—that, if Texas allows "non-consensual concurrent adverse representation," we will stand alone. According to Delta, forty-five states have adopted the Model Rules of

Professional Conduct promulgated by the American Bar Association and four states still follow the Model Code of Professional Responsibility that was the ABA's predecessor to the Model Rules—both of which prohibit concurrent adverse representation without consent. MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7(a)(2) (1994); ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1495 (1982) (concluding that, under the ABA Model Code, a lawyer may not accept representation adverse to an existing client even in an unrelated matter and stating the answer would be the same under the proposed Model Rules); *In re Dresser Indus., Inc.,* 972 F.2d 540, 544 (5th Cir.1992). Federal jurisdictions, including the Fifth Circuit, follow the ABA rule that would prohibit the concurrent representation without Delta's consent. *Dresser Indus.,* 972 F.2d at 544–45.

According to the comments accompanying ABA Model Rule 1.7, "a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.7 cmt. ¶ 3 (1994). Additionally, the American Law Institute's *Restatement of the Law Governing Lawyers,* in its most recent draft, forbids a lawyer from suing a client in another case without all parties' consent, citing a lawyer's duty of loyalty to his clients. RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 209 (Tent. Draft No. 4, 1991) (discussing lawyers' representation of clients opposing former clients in unrelated matters).

In *In re Dresser Indus., Inc.,* the Fifth Circuit issued a writ of mandamus directing the district court to disqualify attorneys opposing Dresser, who concurrently represented it in two other pending lawsuits. 972 F.2d at 546. In so doing, the court noted that neither the Model Code, the Model Rules,

2. The preceding paragraph states:

The Texas Disciplinary Rules of Professional Conduct were adopted by the State Bar of Texas to establish the "minimum standards of conduct below which no lawyer can fall without being subject to disciplinary action." While the disciplinary rules are not controlling as standards governing motions to disqualify, they have been viewed by the courts as guide-

lines that articulate considerations relevant to the merits of such motions. The parties have not offered any countervailing considerations as to why the disciplinary rules should not *be similarly employed in this proceeding.*
*Spears v. Fourth Court of Appeals,* 797 S.W.2d 654, 656 (Tex.1990) (emphasis added) (citations omitted).

nor the ALI draft *Restatement* allows an attorney to bring a suit against its own client without the client's consent. *Id.* at 544–45. The court believed that, if the Texas Rules allow concurrent representation, they were designed to be "the exception and not the rule."[3] *Id.* at 545 n.12. Finally, the court suggested that a party might show "exceptional circumstances," such as "some social interest to be served by [the attorney's] representation that would outweigh the public perception of his impropriety," and be excepted from the rule. *Id.* at 545.

In the latter part of the 1980s the Supreme Court and the State Bar of Texas began a program to push the lawyers of Texas toward "Professionalism." Professionalism is defined, in its broadest sense, as "an aspirational standard of conduct that exceeds the mandates of the Disciplinary Rules of Professional Conduct." Jewel Arrington, *Everyday Professionalism*, 56 TEX.B.J. 232, 232 (1993). Prominent members of the profession, law professors, and members of the Texas Supreme Court wrote and spoke about the duties of members of the legal profession to the public, to each other, to the courts, and to their clients. *E.g.*, Eugene A. Cook, *The Search for Professionalism*, 52 TEX.B.J. 1302 (1989); James B. Sales, *Professionalism and the Lawyer: A Need for the Rebirth of Moral Idealism*, 52 TEX.B.J. 622 (1989); A.B.A. Commission on Professionalism, *". . . In the Spirit of Public Service:" A Blueprint for the Rekindling of Lawyer Professionalism*, 112 F.R.D. 243 (1986). By an order dated November 7, 1989, the Supreme Court of Texas and the Court of Criminal Appeals of Texas, acting jointly, promulgated the Texas Lawyer's Creed—A Mandate for Professionalism. Texas Lawyer's Creed—A Mandate for Professionalism (adopted November 7, 1989), *reprinted in* TEXAS RULES OF COURT 501 (West 1995). Since the adoption of the Creed, members of the legal profession have continued to prolifically address the issue of professionalism. Sherman A. Ross, *Order in the Court: A Judge's Perspective on Professionalism for the Bench and Bar*, 32 THE

HOUSTON LAWYER 29 (1995); Joe G. Roady, *What Exactly is Professionalism?*, 32 THE HOUSTON LAWYER 23 (1995); Jack Hunter, *Ethics and the Law: A Return to Professionalism*, 57 TEX.B.J. 1102 (1994); Eugene A. Cook, *Professionalism for Today's Lawyer*, 57 TEX.B.J. 1094 (1994); William B. Hilgers, *The Path of Professionalism*, 57 TEX. B.J. 1088 (1994); Melinda Smith, *State Bar Combats Unprofessional Behavior*, 57 TEX. B.J. 1058 (1994); Burnele V. Powell, *Lawyer Professionalism as Ordinary Morality*, 35 S.TEX.L.REV. 275 (1994); Byron C. Keeling, *A Prescription for Healing the Crisis in Professionalism: Shifting the Burden of Enforcing Professional Standards of Conduct*, 25 TEX.TECH.L.REV. 31 (1993); Eugene A. Cook, *Professionalism and the Practice of Law*, 23 TEX.TECH.L.REV. 955 (1992); Timothy J. Sullivan, *The Crisis in Lawyers' Professionalism*, FOR THE DEFENSE, June 1991, at 25; W. Frank Newton, *Crisis in the Legal Profession*, 21 TEX.TECH.L.REV. 897 (1990). As recently as January 20, 1995, the State Bar of Texas Board of Directors instituted the Professionalism Enhancement Program (PEP), designed to address professionalism issues for lawyers.

In its opening paragraph, the Creed states: "Professionalism requires more than merely avoiding the violation of laws and rules." The Texas Lawyer's Creed—A Mandate for Professionalism (1989). Among its aspirational provisions is a section titled "Lawyer to Client," which provides:

A lawyer owes to a client allegiance, learning, skill, and industry. A lawyer shall employ all appropriate means to protect and advance the client's legitimate rights, claims, and objectives. A lawyer shall not be deterred by any real or imagined fear of judicial disfavor or public unpopularity, nor be influenced by mere self-interest.

.        .        .        .        .

3. I will be loyal and committed to my client's lawful objectives, but I will not

---

3. In fact, the court pointed out that, "[e]ven if the Texas rules had applied, no special circumstances being present here, Texas rule 1.06's prohibition of representation of potentially adverse interests would have barred the representation." *In re Dresser Indus., Inc.*, 972 F.2d 540, 545 n.12 (5th Cir.1992).

permit that loyalty and commitment to interfere with my duty to provide objective and independent advice.

*Id.* Thus, our highest courts have committed the profession to ethical conduct beyond "laws and rules" and to a duty of loyalty to its clients. How, then, can we justify "standing alone" in allowing concurrent representation of adverse interests without the clients' consent? We are told repeatedly that lawyers rank near the bottom of the list in public trust. Considering the apparent perception that lawyers will go to any lengths to further their own financial interests and the realization that, in this instance, the system not only allows it to happen, but seems to encourage it, it is no wonder the public reacts as it does.

The order of the Supreme Court and the Court of Criminal Appeals adopting the Creed states:

> The desire for respect and confidence by lawyers from the public should provide the members of our profession with the necessary incentive to attain the highest degree of ethical and professional conduct. These rules are primarily aspirational. Compliance with the rules depends primarily upon understanding and voluntary compliance, secondarily upon re-enforcement by peer pressure and public opinion, and finally *when necessary by enforcement by the courts through their inherent powers and rules already in existence.*

Order Adopting the Texas Lawyer's Creed— A Mandate for Professionalism, 783–84 S.W.2d XXXIII (Adopted November 7, 1989) (emphasis added). I do not believe that we can or should disregard the mandate of this order.

Will McKool Smith accord Norris Industries its best efforts against a defendant whose interests it represents in other highly-charged matters? Will McKool Smith give Delta its best representation after it has forced Delta to seek its disqualification in this proceeding? Even if it does both, will each client *believe* that its interests have been properly served by a system that allows lawyers to, at the same time, represent and oppose a client? I fear that the profession is ill served in the eyes of the public if concurrent representation is allowed.

I would adopt the following standard to adjudicate the disqualification of lawyers for concurrent representation: A lawyer must not represent a client in one case and oppose that same client in a simultaneously pending case, even when the two cases are unrelated to each other, unless: 1) both clients give consent after consultation; or 2) there is an exceptional circumstance whereby the lawyer can show "some social interest to be served by his representation that would outweigh the public perception of his impropriety." *Dresser Indus.*, 972 F.2d at 545. In other words, absent consent after consultation, if a lawyer's reason for suing his own client does not have some basis in serving an overriding societal or professional interest, disqualification should be granted.

Alternatively, I would hold that Rule 1.06(b)(2) prohibits concurrent representation in this case. TEX. DISCIPLINARY R.PROF. CONDUCT 1.06(b)(2) (1989). It provides (in part): "[A] lawyer shall not represent a person if the representation of that person . . . reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client." *Id.* The interests to be protected by this rule include "the preservation of the intangible representation elements of loyalty and client confidence essential to any attorney-client relationship, the preservation of client confidences, [and] the assurance of unfettered advocacy on behalf of each client." *Conoco Inc. v. Baskin,* 803 S.W.2d 416, 419 (Tex.App.—El Paso 1991, orig. proceeding). Because concurrent representation ignores the element of loyalty and the need for unfettered advocacy on behalf of each client, I would hold that rule 1.06(b)(2) prohibits it.

Respondent relies on *Conoco Inc.* to conclude that Texas law interprets Disciplinary Rule 1.06 to *permit* concurrent representation. *See id.* In that case, the challenged law firm represented Conoco in six lawsuits, and Conoco sought to disqualify the firm from representing an opposing party. *Id.* Although *Conoco Inc.* is one of the few cases in which a law firm was *not* disqualified for suing a current client, the court did not decide the case, as Respondent contends, on

grounds that Texas law interprets Rule 1.06 to permit concurrent representation. *Id.* Instead, the court focused on Conoco's effective consent to concurrent representation and the waiver of its complaint. *Id.* at 419–20. The court noted that five of the six cases in which the law firm had represented Conoco had been resolved, and the only remaining case was one in which the firm had withdrawn. *Id.* at 421. "Given the intangible elements of loyalty and client confidence in full devotion by counsel, the best that can be said for Conoco's position is that the conflict may have presented an affront to those interests in [the sixth case] and that has been corrected by [the law firm's] withdrawal." *Id.* at 422.

Proponents of allowing concurrent representation may argue that, under a standard of total prohibition, wealthier clients could monopolize the best legal representation in a community by placing them on retainer, and that this would prove especially harmful to rural areas with few lawyers, or for subjects of law with few legal specialists. I believe that, considering the great numbers of attorneys practicing in Texas and the relative parity of their skills, the powerful forces of competition will work to forge new "specialists" and provide quality legal representation whenever and wherever economic incentives justify it.

Because I do not believe that we should allow concurrent representation, I dissent from the dismissal as improvidently granted of Delta's motion for leave to file the petition for writ of mandamus. I would conditionally grant a writ of mandamus requiring the Respondent to disqualify McKool Smith under these circumstances.