In re EASTERN SUGAR ANTITRUST LITIGATION

PANTRY PRIDE, INC., Burlington Food Stores, Inc., Frankford-Quaker Grocery Co., Appellants,

v.

FINLEY, KUMBLE, WAGNER, HEINE, UNDERBERG & CASEY, Appellee.

Nos. 82–1047, 82–1048.

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1982.

Decided Dec. 30, 1982.

Harold E. Kohn (argued), Robert J. La-Rocca, Kohn, Savett, Marion & Graf, P.C., Philadelphia, Pa., for appellants.

Joseph D. Tydings (argued), Gerald W. Heller, Finley, Kumble, Wagner, Heine, Underberg & Casey, Washington, D.C., for appellee.

Before SEITZ, Chief Judge, and GARTH and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Chief Judge.

Pantry Pride, Inc. (Pantry Pride), Burlington Food Stores, Inc. (Burlington), and Frankford-Quaker Grocery Co. (Frankford-Quaker) appeal from two orders of the district court. One appeal, No. 82–1048, is from an order denying appellants' Rule 60(b) motion to vacate an award of attorney's fees to the law firm of Danzansky, Dickey, Tydings, Quint and Gordon (Danzansky, Dickey). The other, No. 82–1047, is from an order granting supplemental fees to Finley, Kumble, Wagner, Heine, Underberg and Casey (Finley, Kumble) for services performed by members of the firm who had belonged to Danzansky, Dickey before a merger of the two firms. The district court directed the entry of each order as a final judgment under Federal Rule of Civil Procedure 54(b) based upon an express determination of no just reason for delay. This court has jurisdiction of these consolidated appeals under 28 U.S.C. § 1291 (1976).

## I. Facts

These appeals concern two awards of attorneys' fees following the settlement of a class action, the procedural history of which is set out in *In re Sugar Industry Antitrust Litigation,* 73 F.R.D. 322, 332–33 (E.D.Pa. 1976). Appellant Frankford-Quaker was one of the class members in *Eastern Sugar.* Appellants Pantry Pride and Burlington, although not class members, participated in the settlements between the class and all of the defendants except RSN Projects, Inc., and the National Sugar Refining Co. (National defendants). Appellee Finley, Kumble represented the National defendants until October 19, 1981, when the district court ordered its withdrawal. Danzansky, Dickey represented the retail grocer class; its managing partner, Joseph Tydings, also acted as co-lead counsel for plaintiff class. Danzansky, Dickey merged with Finley, Kumble on February 1, 1981, taking the name of the latter firm.

The settlement agreement between class plaintiffs and the eleven defendant sugar refiners occurred in two relevant phases. On August 6, 1979, the district court approved settlements between class plaintiffs and eight of the eleven defendants which produced a single settlement fund of $23,-633,000. Appellants Pantry Pride and Burlington participated in these settlements by permission of the district court. At the time of the court's approval, neither appellants nor any class member objected to the settlements or to the proposed payment of attorneys' fees out of the fund.

The following December, plaintiff class came to terms with defendant Borden, Inc. (Borden), and the National defendants for the sum of $1,750,000. This amount was subsequently apportioned between Borden, ($1,100,000) and the National defendants ($650,000). Appellants Pantry Pride and Burlington participated in the settlement between plaintiff class and defendant Borden, but preferred to continue their separate suits against the National defendants. The district court gave preliminary approval to the Borden and National settlements on January 15, 1980, and entered its final approval without objection on May 16, 1980.

To compensate Danzansky, Dickey for services performed for the plaintiff class, the district court after notice and hearing entered two orders authorizing payment of attorneys' fees to the firm out of the settlement fund. The first order, entered as a final judgment on October 19, 1980, awarded attorneys' fees of $868,755.70 to Danzansky, Dickey for services performed from the beginning of its representation in 1975 until February 1, 1980. On December 24, 1980, appellants filed a motion under Federal Rule of Civil Procedure 60(b) requesting the district court to vacate this order as a sanction for the alleged failure of Danzansky, Dickey to make a timely disclosure of its merger negotiations with Finley, Kumble. The district court denied appellants' rule 60(b) motion by an order entered October 19, 1981. Appellants filed a notice of appeal from this denial on November 7, 1981.

The court's second fee award order, entered as a final judgment on September 16, 1981, granted Finley, Kumble supplemental attorneys' fees of $120,880.47 for services performed by former members of Danzansky, Dickey from February 2, 1980 to February 1, 1981. Appellants filed a notice of appeal from this order on October 12, 1981.

This court ordered consolidation of the two appeals, in which appellants ask that Finley, Kumble be ordered to restore $195,-068 to the settlement fund. This sum represents the fees and costs awarded as compensation for services performed for the plaintiff class between November 1979, the date on which appellants suggest that disclosure of the merger negotiations was required, and February 1, 1981.

## II. Standing

As a preliminary matter, Finley, Kumble contends that because Pantry Pride and Burlington were not parties to the class action, they lack standing to challenge either the district court's denial of the Rule 60(b) motion or its award of supplemental attorneys' fees. The general rule is that in order to have standing to appeal, the appellant must be privy to the record and aggrieved by the order appealed from. *Com-*

*monwealth of Pennsylvania v. Rizzo,* 530 F.2d 501, 509 (3d Cir.), *cert. denied,* 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976); 9 J. Moore, Moore's Federal Practice § 203.-06, at 3–20 (1980 ed.). Pantry Pride and Burlington have sufficient ties to the proceedings below by virtue of their participation in the class settlements with nine of the eleven defendants. *See* 9 J. Moore, Moore's Federal Practice § 203.06, at 3–23. Furthermore, appellants Pantry Pride and Burlington are aggrieved by the court's orders because the fees awarded to Danzansky, Dickey were paid out of the settlement fund, reducing appellants' recovery from that fund. *See* H. Newburg, Class Actions § 6960d, at 1241 (1977). Because we find that appellants Pantry Pride and Burlington therefore have standing to challenge each fee award order, we need not reach appellee's arguments that appellant Frankford-Quaker lacks standing.

### III. Merits

The question of what ethical obligations may have arisen from the merger negotiations between Danzansky, Dickey and Finley, Kumble in this case is one of first impression under the ABA Model Code of Professional Responsibility. The history of those merger negotiations is as follows. On November 11, 1979, Stephen Kumble of Finley, Kumble met Tydings at a social event and first mentioned his desire to speak with Tydings concerning "a matter of mutual interest to our firms." On January 10, 1980 Tydings and Kumble met in Tydings' office, Kumble inquiring whether Danzansky, Dickey would be interested in an association with Finley, Kumble. Other meetings between partners of Danzansky, Dickey and Finley, Kumble took place on February 15, 1980 and April 3, 1980.

On June 27, 1980 the full Danzansky, Dickey partnership voted to initiate merger negotiations with Finley, Kumble. Negotiators for both firms met on several subsequent dates, including August 11, 1980, September 25, 1980 and October 14, 1980. On October 16, 1980 Danzansky, Dickey voted to merge with Finley, Kumble. In Novem-

ber of that year, Danzansky, Dickey publicly revealed the merger negotiations. On December 18, 1980, Finley, Kumble disclosed the merger negotiations to the district court. The merger was consummated on February 1, 1981.

In its denial of appellants' rule 60(b) motion, the district court held that no impropriety resulted from the decision of Danzansky, Dickey not to disclose these negotiations to the court. The court thought it was important that Tydings received the lowest fee award among the three co-lead counsel for plaintiff class, and that most of Tydings' services for plaintiff class were performed before any discussion of a merger between the law firms took place. In our reading of the court's bench opinion, however, we can find no indication that it considered whether the failure to disclose may have generated the appearance of impropriety. Presumably, the court's ruling on the 60(b) motion also underlay its willingness to grant Finley, Kumble supplemental attorneys' fees.

The district court's denial of appellants' rule 60(b) motion is reviewable only for abuse of discretion, *Giordano v. McCartney,* 385 F.2d 154, 155 (3d Cir.1967), as is the award of supplemental fees, *Lindy Brothers Builders Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 166 (3d Cir.1973), except where purely legal issues are involved. *United States v. Miller,* 624 F.2d 1198, 1201 (3d Cir.1980) (whether ABA disciplinary rule prohibits certain professional conduct subject to plenary review). We believe the district court abused its discretion with regard to the 60(b) motion by failing to consider whether an appearance of impropriety emerged from the failure of Danzansky, Dickey to disclose its merger negotiations at least to the district court. Furthermore, we think this abuse also infects the court's supplemental fee award order. We hold that as of June 27, 1980, Danzansky, Dickey had a duty to avoid the appearance of impropriety which required disclosure of its merger discussions at least to the district court. We will proceed to analyze the ori-

gin of the duty in this context and the scope of that duty.

## A. Duty

We begin by noting that the ABA Model Code of Professional Responsibility, adopted by the Supreme Court of Pennsylvania, 42 Pa.Cons.Stat.Ann. (Purdon 1975), provides the standard of conduct for attorneys practicing before the United States District Court for the Eastern District of Pennsylvania. Local Rule 14(IV). Appellants suggest that the merger negotiations in this case gave rise to duties of professional responsibility under Canons 4, 5 and 9 of the Code. We will consider each of these Canons in turn.

■ Canon 4 states that "a lawyer should preserve the confidences and secrets of a client." By assuring that discussions with counsel will remain confidential, the rule encourages a client to seek legal advice and to communicate to his attorney all facts essential to his effective representation. EC 4–1. DR 4–101(B) implements this policy by providing, subject to limited exceptions, that a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or a third person, unless the client consents after full disclosure.

Appellants cannot establish violations of these Canon 4 prohibitions in the present case, however, having offered no evidence that Danzansky, Dickey shared confidences of the plaintiff class with Finley, Kumble or used confidences to the disadvantage of the class or for its own benefit.

■ Appellants' contention that Danzansky, Dickey violated Canon 5 also falls short. Canon 5 states that "a lawyer should exercise independent professional judgment on behalf of a client." EC 5–3

recognizes that a lawyer's personal interests may compromise his independent professional judgment in some circumstances, and provides the following guide to professional responsibility in that regard.[1]

Even if the property interests of a lawyer do not presently interfere with the exercise of his professional judgment, but the likelihood of interference can reasonably be foreseen by him, a lawyer should explain the situation to his client and should decline employment or withdraw unless the client consents to the continuance of the relationship after full disclosure.

The rationale underlying EC 5–3 is the avoidance of situations in which the lawyer is tempted to curtail the intensity of its representation for personal gain. In the present context, the fear is that Danzansky, Dickey might have reduced the vigor with which it pursued the interests of the plaintiff class as consideration for obtaining more favorable terms of merger with Finley, Kumble. Implicit in this scenario is that the interest of class plaintiffs allegedly sacrificed by Danzansky, Dickey would have had to have been adverse to interests of the National defendants, represented by Finley, Kumble. Otherwise, Finley, Kumble would have had nothing to gain by encouraging Danzansky, Dickey to sell out class plaintiffs, and hence no reason to offer more favorable merger terms.

We believe there was no inconsistency with EC 5–3 in the instant case, however, because at the time when merger discussions advanced to the stage where a union between Danzansky, Dickey and Finley, Kumble became a reasonable probability, the interests of the plaintiff class and the National defendants were no longer sufficiently adverse. To begin, we believe a future merger did not become a reasonable likelihood until June 27, 1980. Until this time, deliberations between Danzansky, Dickey and Finley, Kumble consisted only of general discussions between a few indi-

---

1. As noted in the Preliminary Statement to the Code of Professional Responsibility: " 'The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific circumstances.' "

vidual partners concerning the background and histories of the two firms. The foreseeability before June 27, 1980 that a merger would take place between Danzansky, Dickey and Finley, Kumble was decreased further by a history of rather summary rejections by Danzansky, Dickey of prior merger proposals made by other firms. We believe it was only after the full Danzansky, Dickey partnership voted to initiate formal negotiations that the likelihood of a merger became probable enough to have theoretically jeopardized the independent judgment of Danzansky, Dickey.

As of June 27, 1980, however, the adverse interests of the plaintiff class and the National defendants had dissipated to the extent that they were insufficient to undermine the independent professional judgment of Danzansky, Dickey. By this time, the district court had approved each of the class settlements with all defendants. All that remained was approval of attorneys' fee payments out of the settlement fund, distribution of the fund to the class, and resolution of appellants' post-settlement motion to vacate the settlement with the National defendants. Plaintiffs' attorneys' fees and the class distribution were matters, however, in which the National defendants, and thus Finley, Kumble, had absolutely no interest. *See* H. Newburg, Class Actions § 6960d, at 1241. Neither have appellants demonstrated that the National defendants had an adverse relationship with class plaintiffs concerning appellants' motion to set aside the National settlement. In sum, we have found no evidence that the merger negotiations caused any actual dilution of the independent judgment of Danzansky, Dickey in representing class plaintiffs.

 Notwithstanding the innocence of Danzansky, Dickey under Canons 4 and 5 of the ABA Model Code, we believe the firm's failure to disclose its merger negotiations with Finley, Kumble as of June 27, 1980 contravenes the Canon 9 requirement that a lawyer must avoid even the appearance of professional impropriety. The rationale underlying Canon 9 is the important one of maintaining public confidence in the integrity of our system of justice and in the legal profession. EC 9–1. As we said in *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (3d Cir.), *cert. denied*, 429 U.S. 830, 97 S.Ct. 90, 50 L.Ed.2d 94 (1976), "the appearance of conduct associated with institutions of the law [is] as important as the conduct itself." *Id.* at 1088.

 Although the appearance of impropriety standard has been criticized recently, *see* Proposed Final Draft, ABA Model Rules of Professional Conduct 40 (June 30, 1982) (omitting Canon 9 as overbroad and question-begging), Canon 9 is still the law in this circuit. *Kramer v. Scientific Control Corp.*, 534 F.2d at 1089. Analysis of ethical duties arising under Canon 9 proceeds on a case by case basis, involving the careful sifting and weighing of all relevant facts and circumstances. *Akerly v. Red Barn System, Inc.*, 551 F.2d 539, 543 (3d Cir.1977). This court must place itself in the position of the average layman, *Kramer v. Scientific Control Corp.*, 534 F.2d at 1091–92, and ask whether at the time the merger negotiations allegedly gave rise to a duty of disclosure, there was a reasonable probability that appellants would have perceived an appearance of impropriety had they learned about the discussions from a source other than counsel or the court. *IBM v. Levin*, 579 F.2d 271, 280 (3d Cir.1978).

 The appearance of impropriety standard is necessarily vague. To mark its precise contours, this court in the past has looked to other provisions of the ABA Model Code for guidance, including Canon 4, *Richardson v. Hamilton Int'l Corp.*, 469 F.2d 1382 (3d Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973), and Canon 5, *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (3d Cir.1976). Canons 4 and 5 are also helpful in discerning the appearance of professional impropriety that may have arisen from the merger negotiations in this case. Canon 4, for example, read together with Canon 9 leads to the conclusion that as merger negotiations progress, a client who learns of those dis-

cussions from a source other than counsel or the court may reasonably suppose that the firms are exchanging confidential information. Such a belief on the part of a layman may be reasonable even though the firms in fact have not disclosed client confidences. *Woods v. Covington County Bank*, 537 F.2d 804, 813 (5th Cir.1976). Firms contemplating mergers and determining the possible advantages thereof have an interest in learning the details of each other's operations, including the identity of clients and the substance of any possible conflicts of interest. *See* Cantor, Merger or Acquisition of Law Practices, 52 N.Y.S.B.J. 650 (Dec. 1980). Clients may extrapolate from this exchange of information an exchange of client confidences as well. The result would be hesitance on the part of the client to discuss freely whatever he wishes with his attorney, a result the ABA Model Code expressly sought to avoid. EC 4–1.

Similarly, Canon 5 read with Canon 9 leads to the conclusion that at some point in merger negotiations between law firms, a client who discovers those discussions from a source other than his attorney or the court may feel that counsel no longer can exercise independent professional judgment on his behalf. A client whose attorney is involved in merger negotiations with a firm representing clients with interests adverse to his own may wonder whether his attorney might compromise his representation for favorable terms of merger. Likewise, a client in the above posture may fear that his attorney will weigh the benefit to accrue to his new firm from a victory by the client against the benefit of a victory by the adversary, and act according to the result of this balancing. The result of either perception would be an erosion of public confidence in the loyalty of the legal profession. EC 5–1 n. 1.

We believe these Canon 9 interests were implicated in the instant case as of June 27, 1980, the date on which the full Danzansky, Dickey partnership voted to initiate merger negotiations with Finley, Kumble, for the following reasons. To begin, the appearance that Danzansky, Dickey may have revealed client confidences first arose at this time. Until June 27, negotiations between the two firms had involved only general discussions of the nature and background of the firms. After the June 27 date, the firms negotiated through officially appointed teams, who presumably would have exchanged information in more detail. At the very least, the negotiating teams would have had significantly greater opportunity and incentive to exchange information in more detail. We believe the formal initiation of merger negotiations is the point in this case at which an average layman could have reasonably feared that the preservation of client confidences might be in peril.

Furthermore, we believe the initiation of formal merger negotiations is the point at which the Canon 9 directive to avoid the appearance of compromise of independent judgment attaches in this case.[2] Until June 27, 1980, merger discussions between Danzansky, Dickey and Finley, Kumble had involved meetings of only a few, individual partners of those firms. After June 27, however, the firms began to meet through official, appointed negotiating teams. Although by this time the actual adversity of interests between class plaintiffs and defendants had disappeared, we believe the average layman could well have perceived, albeit incorrectly, the remaining matters pending before the court as providing adequate opportunities for counsel to betray their interests. This is at the heart of the appearance of impropriety doctrine.

Our finding that class plaintiffs may reasonably have carried over their perception of conflict with the National defendants from stages of the lawsuit in which actual conflict existed to phases in which actual conflict had dissipated finds support in

---

2. Judge Rosenn believes that in view of what he considers serious discussions that took place from January 10 to May 15, 1980, between some of the senior partners in Danzansky, Dickey and in Finley, Kumble pertaining to a possible merger, disclosures should have been made, at the very latest, at the time final approval for the settlement was sought on May 16, 1980.

ABA Informal Opinion 1115 (June 21, 1969), from which we quote:

> The matter is not to be determined by such facts as that the original services were rendered on the employment of another lawyer, or that the services may have had no particular bearing upon the phases of the litigation contemplated to be conducted on behalf of the new employer.... Irrespective of any actual detriment, the first client might naturally feel that he had in some way been wronged, when confronted by a final decree obtained by a lawyer employed in his behalf in an earlier part of the same litigation. To maintain public confidence in the bar, it is necessary not only to avoid actual wrong doing, but an appearance of wrong doing.

*Id.* (quoting New York County Bar Opinion 202). Although these statements were intended to provide rules to govern successive representation by lawyers, the analysis of the relationship between Canons 5 and 9 is equally pertinent to this case.

■ Returning briefly to the district court's reasoning for finding no actual impropriety on the part of Danzansky, Dickey, we note that its findings that Tydings received the lowest fee among co-lead counsel and that most of Tydings' services were performed before the merger discussions began do not alter our conclusion with respect to the appearance of impropriety. However reasonable the fee received by Tydings might have been, this does not rebut the appearance that he may have sacrificed the passion of his representation for favorable terms of merger. Moreover, that most of Tydings' services were performed before the merger negotiations began does not address the appearance of impropriety that resulted from his remaining activities. Thus, although the court's findings were important to the determination of no actual impropriety, and are relevant to the issue of sanctions, we find that they have little bearing if any on the appearance on impropriety which arose in this case.

**B. Scope of Duty**

Having found that as of June 27, 1980 a duty to avoid the appearance of impropriety arose from the Danzansky, Dickey-Finley, Kumble merger negotiations, we must now address the scope of that duty. We hold that Danzansky, Dickey should have disclosed the merger negotiations at least to the district court on or shortly after this date. We express no opinion whether disclosure to the court alone would have effected a full discharge of appellees' Canon 9 responsibilities.

In the present case, we believe disclosure of merger negotiations at least to the district court was necessary to ensure that the plaintiffs as well as the general public would not have perceived an appearance of impropriety from those negotiations. *See Saylor v. Lindsley,* 456 F.2d 896, 900 (2d Cir.1972) (attorney has duty to inform court of client's objection to settlement so that it may devise procedures whereby plaintiff, with new attorney, may himself conduct further inquiry if so advised); *cf. Cuyler v. Sullivan,* 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1979) (defense counsel has ethical obligation to advise court promptly when conflict of interest arises in course of trial). Disclosure would have permitted the court to weigh all the circumstances and protect the interests of the parties and the legal system. Had the court been informed of the merger negotiations on or about June 27, for example, it may have decided that further measures, such as disqualification of Danzansky, Dickey or notice to the class, were necessary to eliminate the appearance of impropriety. On the other hand, it may have felt nothing more was required. In any event, the proper balance was one for the court to strike, not counsel.

In its bench opinion denying appellants' Rule 60(b) motion, the district court said, "[w]hile it is not usual for competing law firms to discuss [the] merger of their law firms, there should be no requirement that at the mention of the subject that all clients where there are antagonistic interests must be immediately notified and referred to oth-

er practitioners." This statement overstates the problem, in our view. Just because disclosure to a large class might be unnecessarily burdensome in many cases does not mean that mere disclosure to a court is unreasonable. Likewise, it is unclear that referral to other practitioners would be necessary in all or any of these cases. Moreover, as we have held in this case, the duty of disclosure to the court need not arise at the "mere mention of the subject." For example, in this case disclosure became necessary only when the merger discussions advanced from the level of informal discussions and inquiries between individual partners to that of formal negotiations between official negotiating teams.

### IV. Sanctions

■ Having found that the district court abused its discretion in holding that Danzansky, Dickey did not have a duty to disclose its merger negotiations to the court as of June 27, 1980, we must consider whether return of the attorneys' fees paid to Danzansky, Dickey and Finley, Kumble is an appropriate sanction. This court approved the use of sanctions to effect discipline and deterrence for the failure to avoid the appearance of impropriety in *Kramer v. Scientific Control Corp.*, 534 F.2d 1085 (3rd Cir.1976).[3] The purpose of ordering return of attorneys' fees as a sanction is two-fold: to discipline specific breaches of professional responsibility, and to deter future misconduct of a similar type. *See* Developments in the Law—Conflicts of Interest, 94 Harv.L.Rev. 1493–95 (1981).

■ Some courts have used the deterrence rationale to disallow attorneys' fees for services rendered before the occurrence of the ethical violation in question. *See In re New York, New Haven & Hartford R.R. Co.*, 567 F.2d 166, 176 (2d Cir.) (usual consequence of professional impropriety is forfeiture of all pay), *cert. denied*, 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977); *Financial*

*General Bankshares, Inc.*, 523 F.Supp. 744, 773 (D.C.Cir.1981) (same), *vacated on other grounds*, 680 F.2d 768 (D.C.Cir.1982). We agree that return of fees paid for services rendered before the date of the impropriety may be an appropriate remedy for some ethical violations. Yet, because such a remedy provides the client with a windfall and deprives the attorney of fees earned while acting ethically, we believe such a sanction should be reserved for cases in which the breach of professional ethics is so egregious that the need for attorney discipline and deterrence of future improprieties of that type outweighs the former concerns. *See Chicago & W. Towns R.R. v. Friedman*, 230 F.2d 364, 369 (7th Cir.) (permitting "reasonable allowance" for services performed before breach), *cert. denied*, 351 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956); *Silbinger v. Prudence Bonds Corp.*, 180 F.2d 917, 921 (2d Cir.) (disgorgement of fees paid for services performed before breach unnecessary if return of award for services performed after breach is adequate sanction), *cert. denied*, 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950).

■ In the present case, the attorneys' fees granted in the district court's first fee award order were intended to compensate Danzansky, Dickey for services performed between 1975 and February 1, 1980. Because the end of this period precedes the date of the ethical violation, June 27, 1980, an order requiring Danzansky, Dickey to give back any portion of these fees would be appropriate only if the firm's failure to disclose its merger negotiations constituted a particularly egregious violation of professional ethics. Normally this decision would be one for the district court to make in its discretion. However, we believe it would be an abuse of discretion under the circumstances of this case if the district court on remand were to order return of these fees.

---

**3.** We recognize that the Preliminary Statement to the ABA Model Code distinguishes between the canons, which it terms "axiomatic norms", and the disciplinary rules, which provide the "minimum level of conduct" for attorneys. In *Kramer*, this court held that sanctions are ap-

propriate to remedy violations of Canon 9 as well as the disciplinary rules. 534 F.2d at 1092–93 (requiring disqualification of class counsel whose partner was class representative in class action suit as "antidote" for appearance of impropriety under Canon 9).

Because the ethical question involved in this case is one of first impression under Canon 9's rather undefined standard, we believe neither attorney discipline nor deterrence of future misconduct of this type would justify disgorgement of fees earned pursuant to ethical conduct. Therefore, we will affirm the district court's denial of appellants' Rule 60(b) motion, even though we disagree with the court's rationale. *See Rhoads v. Ford Motor Co.,* 514 F.2d 931, 934 (3d Cir. 1975).

With respect to the court's second order awarding supplemental attorneys' fees for services rendered between February 1, 1980 and February 1, 1981, we similarly believe it would be an abuse of discretion for the district court to order disgorgement of compensation for services performed between February 1, 1980 and June 27, 1980 for the reasons previously given. Therefore, we will affirm this part of the court's supplemental fee order. We will vacate the part of the court's supplemental fee order that awarded compensation for services performed between June 27, 1980 and February 1, 1981, however, and remand to the district court for a determination of whether in its discretion disgorgement would be a proper sanction for Danzansky, Dickey's violation of Canon 9.

The order at No. 82–1048 will be affirmed. The order at 82–1047 will be affirmed with regard to fees awarded for services rendered from February 1, 1980 until June 27, 1980. The order at 82–1047 will be vacated with respect to fees awarded for services performed between June 27, 1980 and February 1, 1981, and remanded for proceedings in accordance with this opinion.