500 So.2d 274 (1986)
BAMMAC, INC., and Cigna Corporation, Appellants,
v.
Raymond GRADY, Appellee.
No. BJ-127.
District Court of Appeal of Florida, First District.
December 22, 1986.
Rehearing Denied January 26, 1987.
*275 Ralph J. McMurphy of Green, Simmons, Green, Hightower & Gray, P.A., Ocala, and Steven A. Rissman and Manuela C. Napier of Cooper, Rissman & Weisberg, P.A., Orlando, for appellants.
Edward Hurt, Jr. of Hurt, Parrish & Dalton, P.A.; and Bill McCabe of Shepherd, McCabe & Cooley, Orlando, for appellee.
SMITH, Judge.
Appellants appeal a final order of the deputy commissioner which granted the request of appellee, Raymond Grady (claimant), *276 for rehabilitation benefits. Appellants (hereinafter alternatively "E/C") contend that the services provided by claimant's rehabilitation provider were not "rehabilitation" as defined by section 440.49, Florida Statutes (1985), and that the record below contained insufficient evidence of claimant's need for such benefits. Appellants also contend that it was improper for the deputy commissioner to deny their objection to the furnishing of rehabilitative services to claimant by Statewide Rehabilitation, Inc., a corporation owned by the claimant's attorneys. We disapprove the representation of claimant, by his present attorneys, in claims seeking payment for rehabilitation services rendered or to be rendered by Statewide as long as the attorneys maintain their ownership in the corporation. For the reasons hereafter stated, however, we find it advisable to enforce the prohibition against representation by the attorneys only prospectively, not retrospectively, and therefore affirm the rehabilitation order under review here, with directions as to representation in connection with any further rehabilitation claims during the rehabilitation process.
Claimant was involved in an industrial accident, accepted by the E/C as compensable, on January 29, 1980. As a result of the accident, claimant suffered injuries to his left knee and femoral bone, which according to his treating physician, Dr. Fulton, left claimant a "functional amputee." Claimant was rated by Dr. Fulton as suffering a permanent impairment of 36% of the whole man. Claimant reached MMI on November 19, 1984.
Claimant testified at the hearing on his claim for rehabilitation benefits below that he received only nominal assistance from the E/C in his efforts to seek new employment after the industrial accident. According to claimant, the E/C offered no rehabilitation benefits to him even though he had expressed an interest in pursuing employment in a prior job field, electronics assembly. Instead, claimant testified, the E/C merely provided him with lists of prospective employers gleaned from a local newspaper.
Claimant was subsequently successful in securing employment with the Deland Sun Times newspaper as a newspaper carrier. Claimant testified that his net weekly income from this job was $112, based upon a "profit" of $1.05 per customer. Claimant also received a $.15 per mile reimbursement for mileage expenses he incurred. At the time of the hearing below, claimant had accepted a new 400-person route, an increase of approximately 125 customers over his previous route. Claimant's average weekly wage at the time of his industrial accident was stipulated by the parties as $193.41.
Claimant continued to seek rehabilitation benefits from the E/C after he became employed at the Deland Sun Times, expressing a lack of desire to make that job a career. As a result of his dissatisfaction with the E/C's efforts, claimant visited Statewide Rehabilitation, Inc., a company owned by claimant's attorney and members of the attorney's law firm. After undergoing certain testing procedures, an individualized written rehabilitation plan (IWRP) for claimant was submitted to appellant Cigna Corporation, the carrier below, by Charles May, president of Statewide Rehabilitation, Inc. When the E/C declined to authorize the services proposed in the IWRP, claimant filed his pending claim for rehabilitation benefits. The deputy's order granting benefits rejected the E/C's defenses that rehabilitation benefits were not due claimant since he had accepted a higher paying job with the Deland Sun Times, and that an impermissible conflict of interest was established by the ownership interest of claimant's attorney in the rehabilitation provider, Statewide Rehabilitation, Inc., who under the deputy's order would be supervising claimant's IWRP.
Appellants first assert on appeal that the services provided by Statewide Rehabilitation, Inc., are not "rehabilitation" as contemplated by section 440.49(1)(a), which requires rehabilitation benefits to provide "appropriate training and education for suitable gainful employment." Appellants *277 maintain that the testing and evaluation procedures undertaken on claimant's behalf by Statewide Rehabilitation were not "training and education for suitable gainful employment" within the meaning of the above-noted statute. In this regard, appellants assert the sole right to determine which rehabilitation provider they would fund. We find no merit in this contention. For one thing, contrary to appellants' assertions, section 440.49(1)(b)3 c., Florida Statutes (1983), specifically describes "vocational rehabilitation services" to include "vocational ... testing, counseling [and] evaluation ...," the precise services, both provided and proposed, by Statewide Rehabilitation, Inc. Moreover, appellants' contentions that merely providing claimant with a list of prospective employers constitutes "rehabilitation," on the theory that an E/C has the sole discretion to determine a claimant's rehabilitation provider, were rejected in Viking Sprinkler Co. v. Thomas, 413 So.2d 816, 818 (Fla. 1st DCA 1982).
The second aspect of appellants' attack on the award of rehabilitation services requires extensive discussion. Appellants contend that the fact that claimant's attorney maintains an ownership interest in Statewide Rehabilitation, Inc., while at the same time seeking rehabilitation services in behalf of their client to be performed by Statewide, at the E/C's expense, creates an appearance of impropriety that is not permitted under the Florida Code of Professional Responsibility. Testimony before the deputy commissioner by Charles May, an employee of Statewide Rehabilitation, Inc., established that the corporation was formed and owned by the members of the law firm of Hurt, Parrish and Dalton, P.A., one of the law firms representing claimant. Mr. May also testified, however, that his professional judgment regarding the need for vocational rehabilitation services for claimant was not affected in any way by pressure from the law firm representing claimant.
Because we found issues arising from the attorneys' ownership of Statewide Rehabilitation and the E/C's objections on this ground appearing in two other cases pending before the court simultaneously,[1] we consolidated the three cases for oral argument and requested additional briefing. Although we entertained some doubt as to whether the issue was sufficiently raised below and presented here in Bammac, our review of the records in Winter Park (no longer before us) and Munford disclosed that motions for disqualification of claimant's counsel were made in both cases. Further, in Munford, the facts were developed more fully, including sworn testimony by one of claimant's counsel, Mr. Edward Hurt, Sr. The pertinent facts concerning the attorneys' ownership, which are undisputed, are that Statewide Rehabilitation, Inc., was formed by Edward H. Hurt, Sr., David Parrish, and Roy Dalton, the partners in the law firm presently representing these claimants. Mr. May began work as president of the corporation on May 13, 1985, immediately after incorporation. Statewide was organized as a profit-making venture, and its incorporators are the directors of the company. Claimant's attorney, Mr. Hurt, agreed that if the deputy commissioner awarded services to the claimant by Statewide, the billing would be income to the corporation and he would realize profits as a corporate stockholder. Clients may be and have been referred to Statewide for testing and evaluation, and the preparation of an Individualized Written Rehabilitation Plan (IWRP) without the consent of the E/C and without order by the deputy. As of the hearing dates, some sixty percent, or thereabouts, of Statewide's patrons have been referrals from appellee's law firm. Mr. May testified that Statewide provides extensive testing and evaluation, but does not actually perform *278 the retraining which may be recommended in the plan. There was testimony in behalf of the E/C that the same services could be performed by other providers. The order in Bammac (and similar order in Munford) directed the E/C to "provide to the claimant rehabilitation under the direction of Statewide Rehabilitation, Inc., and Statewide Rehabilitation, Inc., is hereby authorized to carry out the vocational objectives as set out in their Individualized Written Rehabilitation Plan dated 5/23/85 and filed with the aforementioned Motion to Compel Rehabilitation herein at the expense of the employer/carrier." We note here that the motion to compel rehabilitation specifically requested that Statewide be authorized to provide the rehabilitation.
After consideration of the additional briefs and oral arguments of counsel for the several parties, we hold that appellee's attorneys' representation of claimants requesting the use of Statewide Rehabilitation, Inc. for the furnishing of rehabilitative testing or other services for which payment will or may be sought from the E/C, or who intend to present any evaluation, plan or recommendation prepared by any officer or employee of Statewide for the purpose of securing a rehabilitation order or award on their behalf, as long as the attorneys own an interest in Statewide, is an unacceptable practice which undermines the integrity and appearance of fairness in workers' compensation proceedings, and must be discontinued. The reasons for our decision follow.
Although we rely heavily upon principles found in the Code of Professional Responsibility governing members of the Florida Bar, soon to be superseded by "Rules of Professional Conduct," Chapter 4, Rules Regulating the Florida Bar, effective January 1, 1987 (see The Florida Bar Re Rules Regulating The Florida Bar, 494 So.2d 977 (Fla. 1986)), it should be noted at the outset that this controversy is in no respect an attorney disciplinary proceeding. Counsel for all parties, and this court, agree that the Supreme Court of Florida has exclusive jurisdiction over the discipline of attorneys. Article V, Section 15, Florida Constitution; Pantori, Inc. v. Stephenson, 384 So.2d 1357 (Fla. 5th DCA 1980). Counsel for both sides are equally candid in acknowledging the duty of the courts to see that the code or rules of professional responsibility, by whatever name, are complied with. Brassell v. Brethauer, 305 So.2d 217 (Fla. 4th DCA 1974); Pantori, Inc. v. Stephenson, supra. Not so clear, however, is the question whether it is necessary for this court to find a breach by claimant's counsel of a specific provision of the rules before condemning the practice complained of in the cases at hand. Appellees concede (in their supplemental, consolidated brief) that this court has jurisdiction and authority to set aside the deputy commissioner's order where an alleged ethical violation by the attorneys under the Code of Professional Responsibility arises. They insist, however, and primarily base their defense on the premise that no ethical violation appears. They also contend that before the court should reverse the deputy commissioner, the court would first have to find that the attorneys have "in part breached" the code; and in addition, that the court would have to make a further finding that the alleged violation was of such a nature that it required reversal of the deputy commissioner's order.
Responding first to the attorneys' contention that the court must find that the attorneys "in fact breached" the code, this is not the interpretation we find appropriate under Canon 9, "A Lawyer Should Avoid Even the Appearance of Impropriety." In Andrews v. Allstate, 366 So.2d 462 (Fla. 4th DCA 1978), an automobile negligence case involving disqualification for conflict in representation by an attorney, the Fourth District observed that the "record ... reveals no actual evidence of any impropriety on the part of petitioner's counsel." 366 So.2d at 463. Nevertheless, the court upheld the trial court's order of disqualification, stating: "However, the professional responsibility of a lawyer goes further; it encompasses even the appearance *279 of professional impropriety." Id. at 463.
The federal court nearest to us gives the same reading of Canon 9. In United States v. Hobson, 672 F.2d 825, 828 (11th Cir.1982) (a case involving disqualification of a defense attorney because of the likelihood of evidence severely impugning the character of the attorney coming before the trial judge) the court stated:
Canon 9 provides: "A lawyer should avoid even the appearance of professional impropriety." The purpose of Canon 9 is to preserve public confidence in the bar and in the legal process. This confidence "may be eroded by irresponsible or improper conduct of a lawyer." A.B.A. Code of Professional Responsibility EC 9-2. Because some conduct that is ethical in fact may be perceived by laypersons as unethical, members of the bar are held by Canon 9 to a standard that prohibits not only actual impropriety, but conduct that may simply appear to be improper. Thus, attorneys have been disqualified under the appearance of impropriety doctrine even where there was no evidence of actual wrongdoing. Woods v. Covington County Bank, 537 F.2d 804, 813 (5th Cir.1976) (citing General Motors Corp. v. City of New York, 501 F.2d 639, 641 (2d Cir.1974); United States v. Trafficante, 328 F.2d 117, 120 (5th Cir.1964)).
The court in Hobson also applied the two-prong test for disqualification under Canon 9 found in an earlier Fifth Circuit case (672 F.2d at 828):
In Woods v. Covington County Bank, supra, the court set forth a two-prong test for disqualification of an attorney under Canon 9. First, although there need not be proof of actual wrongdoing, "there must be at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." 537 F.2d at 813. Second, "a court must also find that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." Id. at 813 n. 12. "Under Canon 9, an attorney should be disqualified only when both of these standards have been satisfied." Id.

While we do not feel we are necessarily bound by the two-prong test adopted by the federal courts, we respect and appreciate the decisions of these courts and find them helpful to us in our deliberations in the matter before us. Were we to apply the two-prong test of Woods to the facts before us, we are confident that the test would be more than satisfied.
It is essential to make clear the posture of the controversy before us. We are not dealing here, obviously, with a single case, but with a continuing problem which is not only present and ripe for resolution in the cases before us, but is a recurring one. In addition to the cases already identified, we are aware of other cases now before us awaiting disposition of this issue. Unlike the usual case involving disqualification of attorneys, disposition of the presently pending claim does not signal the end of the problem. Rehabilitation is a continuing and on-going process that may involve weeks, months, even years, with the attendant possibility (indeed, probability) of further claims and controversies involving the same attorney and the same corporation to be resolved by the deputy commissioner. The cumulative effect of the attorneys' conduct we review here thus gives a significance to these cases far beyond that of a single case.
We conclude that our duty to ensure the integrity and fairness of workers' compensation proceedings, and just as importantly, to maintain the appearance of fairness, is an integral part of the duty of review of orders entered in such proceedings under the authority vested in this court by the Legislature. Article V, Section 4(b)(2), Florida Constitution; § 440.271, Florida Statutes (1985). In carrying out that duty, we assume that we have the powers inherent in the courts generally. We conclude also, consistent with the authorities above cited, that this includes the power to disapprove and prohibit particular *280 practices or proceedings involving attorneys' conduct which appear to us to run counter to the spirit and purposes of the rules governing the practice of law, where necessary to maintain public confidence in and respect for the bar and the courts, and to preserve the integrity of the forum and the process provided for adjudication of controversies between opposing litigants, without finding a breach of ethical rules or standards sufficient to warrant disciplinary action.
We find guidance for our decision in the preamble to the existing Code of Professional Responsibility. The canons are statements of "axiomatic norms," expressing in general terms the standards of professional conduct expected of lawyers in their relationship "with the public, with the legal system, and with the legal profession." (emphasis supplied). Preliminary Statement, Code of Professional Responsibility. The ethical considerations are "aspirational in character and represent the objectives toward which every member of the profession should strive." Id.
Among the ethical considerations embodied in Canon 7 of the code are certain "ethical considerations" under the heading, "Duty of the Lawyer to the Adversary System of Justice." Much of the underlying basis for our decision today is expressed in the language of these guiding principles, which we adopt as part of our opinion. Ethical consideration EC 7-20 states:
EC 7-20. In order to function properly, our adjudicative process requires an informed, impartial tribunal capable of administering justice promptly and efficiently according to procedures that command public confidence and respect. Not only must there be competent, adverse presentation of evidence and issues, but a tribunal must be aided by rules appropriate to an effective and dignified process. The procedure under which tribunals operate in our adversary system have been prescribed largely by legislative enactments, court rules and decisions, and administrative rules. Through the years certain concepts of proper professional conduct have become rules of law applicable to the adversary adjudicative process. Many of these concepts are the bases for standards of professional conduct set forth in the Disciplinary Rules. (emphasis supplied)
Further, EC 7-22 states in part:
Respect for judicial rulings is essential to the proper administration of justice... .
EC 7-24, in part, provides:
EC 7-24. In order to bring about just and informed decisions, evidentiary and procedural rules have been established by tribunals to permit the inclusion of relevant evidence and argument and the exclusion of all other considerations. The expression by a lawyer of his personal opinion as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused is not a proper subject for argument to the trier of fact... . (emphasis supplied)
Further expressions of the goals and objectives of the legal system under which we operate can be found in other language of the code, and is perhaps finally best embodied in EC 9-1: "Continuation of the American concept that we are governed by rules of law requires that the people have faith that justice can be obtained through our legal system. A lawyer should promote public confidence in our system and in the legal profession." That the exact language of these soon-to-be-discarded "ethical considerations" cannot be found in the comparatively arid passages of the newly-adopted rules does not persuade us that they are no longer pertinent. Although couched in different language, the spirit and purpose of the new rules remain the same. Furthermore, we adopt the premise that the above-quoted excerpts so clearly express the accepted standards for the operation of the judicial system as to make their inclusion in a compilation of rules superfluous.
Turning to the arguments in the case before us, we observe first that we are not here primarily concerned with the duties and responsibilities of the attorneys to *281 their client, the claimant. That the attorneys have dealt fairly, openly and ethically with their client by making a full disclosure of their proprietary interest in Statewide Rehabilitation, Inc., simply does not resolve the problem before us. As stated in United States v. Hobson, the fact that the claimant agrees fully with all actions by the attorneys is immaterial, since the client is not free to waive matters involving the public's perception of the judicial system and the lawyer. 672 F.2d at 829. It is unnecessary, therefore, for us to burden this opinion by considering arguments as to the standing of the E/C to question the propriety of the attorneys' dealings with their client. In fairness, however, we should point out that no contention is made that the claimant has been prejudiced in any manner. Indeed, we think it is fairly conceded that Mr. May, the expert employed by Statewide, is a highly experienced, qualified, and honorable practitioner in the field of rehabilitative services.
Similarly, the competence and integrity of claimant's attorneys, who are well known for their expertise and high standing in what may be referred to as the workers' compensation bar of this state, are in no way questioned by appellants, but are expressly reaffirmed by attorneys for the E/C's in their briefs and arguments. This substantially relieves any fear of prejudice to the E/C resulting from any improper control or influence by the attorneys over Statewide's officers and employees in the cases before us. Indeed, one of the main points of appellee's argument before us is the absence of any control by the attorneys over the day-to-day operations of Statewide, and the absence of any effort on their part to influence Mr. May in his evaluations or testimony. Nevertheless, these same considerations, namely, the reputation, integrity and standing of claimants' attorneys, raise questions of prejudice of a different kind. Is the deputy commissioner (who, it must be assumed, has equal or even superior favorable knowledge of claimant's attorneys) likely to be more inclined by reason of the attorneys' involvement with the rehabilitation provider to accept the evidence from or to favor the provision of rehabilitative services by that provider, rather than one in which the attorneys have no interest or control? It seems clear that when the claimants' attorneys call their own personally selected, approved and employed expert witness to testify, the effect is tantamount to placing the attorney's own integrity, competence and judgment in issue. An attack on the expert by the E/C would be an attack on the attorneys.[2] This places an additional burden upon a party called upon to oppose such testimony which is not present when the claimant is represented by other attorneys, and results in fundamental unfairness, or at the very least, the appearance of unfairness.
It is unfortunate that these issues of ownership, control and monetary interest of the attorneys have been injected into these proceedings. It appears virtually certain, however, that if the practice complained of is allowed to continue, this would become a regular, divisive and disruptive, but totally unproductive collateral issue in every rehabilitation case involving the same attorneys. It is also significant that the prospect of the lawyer acting both as an advocate and as a witness on behalf of his client [as occurred particularly in Munford] is an ever-present consideration. The new rules regulating the legal profession (specifically, rule 4-3.7) quite clearly provide that a lawyer "shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of his or her client," with certain exceptions, none of which would govern the problem at hand. Such matters as the extent of the attorney's influence and control over the rehabilitative provider, including the procedures and practices employed *282 by the provider, and the attorney's proprietary interest in the business itself  matters as to which the E/C has a right to and should inquire  go beyond "a matter of formality," as that phrase is used in exception (2) of the rule. The reasoning of the court in Zylstra v. Safeway Stores, Inc., 578 F.2d 102, 104 (5th Cir.1978) (attorneys disqualified to represent plaintiffs in class action suit in which attorneys were partners or sponsors of named plaintiffs or were themselves members of the class) seems also pertinent here (after holding attorneys subject to a per se rule of disqualification under Canon 9):
We reach that conclusion because of the conflict of interest which is inherent in such a situation. An attorney whose fees whill depend upon the outcome of the case and who is also a class member or closely related to a class member cannot serve the interests of the class with the same unswerving devotion as an attorney who has no interest other than representing the class members. In the terms of Woods, whenever an attorney is confronted with a potential for choosing between actions which may benefit himself financially and an action which may benefit the class which he represents there is a reasonable possibility that some specifically identifiable impropriety will occur. Furthermore, the public suspicion of such a conflict is sure to outweigh any public benefit from having that attorney continue.
The "Comment" to rule 4-3.7 states: "Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between lawyer and client." Both "prejudice" and "conflict" are the necessary byproducts of the attorney's personal involvement in his client's controverted rehabilitation claims. This involvement presents for the E/C the "Hobson's Choice" of either accepting without question the evidence or services provided through Statewide, or of undertaking to challenge the same before the deputy commissioner, an alternative which the E/C could not undertake without shouldering the undue burden already alluded to above by virtue of the claimant's attorney's involvement. The claimant's attorney, on the other hand, is necessarily called upon to defend Statewide in order to fully advocate the interests of his client. The claimant's attorney, by his own act, is forced into a position of advocating his own proprietary interests or else foregoing the duty to fully represent the interests of his client. See also, EC 5-9, Code of Professional Responsibility.
We are convinced that attorney-owned rehabilitative services have no place in the statutorily-mandated rehabilitation program for injured workers so far as workers represented by the same attorneys are concerned. We find no prohibition against attorneys owning or operating a company providing rehabilitation testing, evaluation, or services. We find it impossible, however, to conceive of the same attorneys advocating the rehabilitation interests of patrons of the business without raising serious questions of "commingling" of the attorneys' proprietary interests with the practice of law. We find no satisfactory answer to the "commingling" issue in appellees' brief and argument. The provisions of the existing code, carried forward into the new Rules of Professional Conduct, circumscribe the lawyer's business relationships with his or her client and prohibit the acquisition of a proprietary interest in litigation. These rules are familiar and generally understood. See, among other provisions, Canon 5, EC 5-2, EC 5-7, DR 5-103, existing code; and Rule 4-1.8(a), (i), and Comment, "Acquisition of interest in litigation," found in the new rules. We have not overlooked several rulings interpreting some of these provisions made by The Florida Bar Committee on Ethics. Nor have we overlooked Florida Bar Staff Opinion TE086132, which is of unknown origin, was not requested by appellee's attorneys, and was issued subsequent to the orders under review. These opinions note some of the ethical considerations arising from the arrangement challenged here, and outline specific steps required to be taken and safeguards to be observed by the lawyer *283 under such circumstances. We find little to encourage the type of relationship here complained of, despite the staff opinion's conclusion that "it appears permissible for attorneys to refer claimants to a rehabilitation provider in which the attorneys have an interest if certain conditions are met." On the other hand, we find much to indicate disapproval. For example, the lawyer "should not mingle his independent business with his law practice, either physically or functionally." Opinion 66-16 (April 7, 1966). Similar expressions are found in Opinions 61-13 (September 8, 1961), 64-45 (August 10, 1964), 63-12 (July 8, 1963), 72-26 (July 10, 1972), and 73-1 (April 20, 1973). While none of these opinions categorically state that the attorneys could not ethically engage in a business to which their workers' compensation clients are referred for rehabilitation services, we note that these opinions deal primarily with the lawyer's relations with his client, and only in a very general way touch upon questions of propriety, vis-a-vis the lawyer's duty to the legal system. None purport to address the issue in relation to the matter of fairness or prejudice to the opposing parties in the arena of workers' compensation litigation, nor the requirements placed on attorneys under Canon 9.
Appellee's attorneys attempt to justify their direct involvement with the client's rehabilitation by citing the fact that numerous insurance companies have their own "in-house" rehabilitation centers. While we do not profess to have firsthand knowledge of the facts asserted, we find no basis for comparison of the practices of insurance companies and the practices of members of the legal profession. Neither the insurance companies nor their insureds, the employers, are officers of the legal system, nor, unlike lawyers, are they governed by a code of conduct casting upon them duties with respect to the administration of justice beyond that required of the ordinary citizen. A more concrete basis for distinction is found, however, in the statute itself, which requires the employer or carrier, "at its own expense" (section 440.49, Florida Statutes) to provide rehabilitation. Thus, the E/C are parties to the controversy, charged with special duties by law. The claimant's attorneys are not parties, and the attempted comparison is inappropriate. We observe also that the Division of Workers' Compensation and the deputy commissioners are perfectly capable of curbing any potential abuses by the E/C. The Division has already moved in this direction by adopting Rule 38F-8.51, Florida Administrative Code, which among other things prohibits rehabilitation service providers from providing adjusting services to any insurance carrier in connection with any workers' compensation case in which the provider has been engaged to furnish rehabilitation services. The rule also prohibits fee arrangements by any rehabilitation provider which would be likely to create conflicts of interest or influence their testimony in claims cases.
The statutes, as interpreted by prior decisions of this court, contemplate a voluntary offering of rehabilitation by the E/C, subject to "acceptance" by the claimant, or failing either or both, an order by the deputy commissioner. Viking Sprinkler; Conshor, Inc. v. Barnhart, 422 So.2d 946 (Fla. 1st DCA 1982); C & H Construction v. Leyman, 453 So.2d 1163 (Fla. 1st DCA 1984); Norris v. Ed Taylor Corporation, 484 So.2d 64 (Fla. 1st DCA 1986). This court has made it abundantly clear that the E/C's do not have unfettered discretion in the choice of the type of rehabilitation, nor in the selection of providers. We do not propose to accord to the claimant's attorneys the right of direct control of rehabilitation already denied to the E/C, nor will we countenance an arrangement indirectly contributing to that result by reason of its tendency to impair the E/C's right to a full and fair determination of rehabilitation issues. In view particularly of the recent history of massive legislative reform of the workers' compensation system in this state, we will not presume that the legislature intended to create a system that would permit the practice here complained of by the E/C. We also conclude that failure to prohibit the intermingling of claimant's rehabilitation *284 with the personal and non-professional interests of claimant's attorneys would be rightly viewed as an abdication of the responsibility placed on this court to preserve the fairness of judicial proceedings, and would of certainty invite legislative intervention, thereby contributing to the demise of an independent legal profession. See, "Preamble," Rules of Professional Conduct, Chapter 4, Rules Regulating the Florida Bar.
In view of the nature of the litigation and the magnitude of the problem before us, we have given considerable attention to the remedy to be applied. Had the deputy commissioners ruled correctly when asked to disqualify the attorneys, there is every reason to believe that other counsel would either have immediately come into the cases, or the request for assignment of Statewide to provide rehabilitation services would have been abandoned. Now, considerably more than a year after the orders in both Bammac and Munford were entered, reversal of the rehabilitation orders would mean even more inordinate delay in providing needed services to these claimants. In an effort to minimize the impact on the claimants, our decision regarding the disqualification of the attorneys owning Statewide Rehabilitation, Inc., shall be prospective in effect only, and will not be applied retroactively to invalidate rehabilitation orders already entered in contravention of the principles expressed herein. Retrospective application would have the effect of harming primarily the injured claimants, none of whom on the records before us have been prejudiced by the activities complained of, but who would be materially disadvantaged should they be required to undergo further testing or evaluation, or have their rehabilitation claims relitigated. Although the E/C's have demonstrated injury to their rights in principle, and ample grounds for disqualification of the attorneys below, none have sought to claim material injury that would outweigh the harm to the claimants if our decision were to be applied at this late date retrospectively. See, International Studio Apartment Association, Inc. v. Lockwood, 421 So.2d 1119 (Fla. 4th DCA 1982), cert. den., 464 U.S. 895, 104 S.Ct. 244, 78 L.Ed.2d 233 (1983) (general rule is that judicial decisions in civil litigation have retrospective as well as prospective application, subject to well established exception proscribing destruction of property or contract rights acquired in accordance with prior construction). However, as to claims not yet brought to hearing before the deputy commissioner by the attorneys owning Statewide, our decision shall apply, except that the deputy commissioner shall have the discretion to deny motions for disqualification of the attorneys, and to approve services already rendered by Statewide, or to accept evidence from Statewide concerning the rehabilitative needs of a claimant, if in his or her opinion failure to do so would result in undue hardship to the claimant. This exception shall not apply, however, if it appears that referral of the claimant to Statewide or the engaging of the services of Statewide by claimants' attorneys owning Statewide occurred subsequent to the date of this decision. So confident are we of the high ethical standards adhered to by appellee's attorneys that we would find it unnecessary to enter any order or mandate to accomplish the purposes of our decision. To the extent that we mandate or prohibit, we do so for the purpose of avoiding any question as to the precedential effect of our decision.
It is difficult to find fault with the deputy commissioners' rulings in these cases in view of the limited and specialized nature of their jurisdiction. It is also entirely possible that this court might have contributed to the problem by overlooking an objection noted by the E/C in a prior case which we affirmed without comment, although with all due respect to appellee's attorneys, who argued before us that this issue was squarely presented in Best Western and Adjustco, Inc. v. Johnson, BI-107, 485 So.2d 426 (Fla. 1st DCA 1986), our examination of the record and briefs in that case indicates otherwise.
Finally, the intended beneficiary of the rules cited, and of our decision today, is not *285 the litigants, nor even litigants as a class, but the judicial system and the faith and confidence of the public in the fair administration of justice. Equally as important to the administration of justice as actual due process and fairness is the appearance of propriety.
The order appealed is affirmed and this cause is remanded for further proceedings consistent herewith.
JOANOS and WIGGINTON, JJ., concur.
NOTES
[1] The two cases are: Winter Park Telephone Company and Professional Administrators, Inc. v. Cecelia A. Salvato, Case No. BJ-46, and Munford, Inc., Self-Insured v. Cathy Necrason, Case No. BJ-122. The Winter Park case was remanded to the deputy commissioner for settlement on joint motion of the parties after oral argument. A separate opinion is being filed in the Munford, Inc. case, in which we make the same disposition of this issue as in the present case.
[2] It may be argued that the same problem would exist even if claimant were represented by attorneys having no interest in Statewide. In that event, however, only the interests and actions of Statewide's owners as entrepreneurs would be involved, and they would not be present and engaged in the litigation before the deputy as advocates in the case.